### THE MERIDA (two cases).

#### (Circuit Court of Appeals, Second Circuit. January 22, 1901.)

#### Nos. 12, 13.

SHIPPING—CARGO DAMAGES—LIABILITY OF SHIPOWNERS.

A cargo of hides and similar articles shipped from South American ports to New York was found at the conclusion of an unusually long voyage, during warm weather, to be seriously damaged from decay. The bills of lading recited that the cargo was received in apparent good order and condition. The cargo owners alleged that the damage was caused by sea water entering the ship through some defect or unfitness, or by want of proper care, while the defense was that the injury resulted from sweating, heat, or natural decay, or from latent defects or dampness existing prior to shipment. The voyage was without storms or unusual weather. *Held,* upon a consideration of all the evidence, that there was no damage by sea water through any leaks or imperfection of the ship, which was shown to be in good condition and thoroughly equipped for the removal of any accumulation of water in the bilges, which nothing in the circumstances of the voyage rendered excessive; that the damage was due either to an excess of moisture in the cargo before shipment, which produced the decay during the long voyage, or to an accumulation of water in the bilges because of their not having been given proper attention by reason of the sickness and death of three of the engineers from yellow fever during the voyage, in which case the failure to use the pumps was a fault in the management of the vessel, for which the owners were exempted from liability by section 3 of the Harter act.

Appeals from the District Court of the United States for the Southern District of New York.

Two libels were brought in the district court for the Southern district of New York against the steamship Merida to recover the damages sustained to consignments of hides and bales of horse hair and glue stock shipped to the different libelants on the steamship in May and June, 1898, and arriving in New York in a damaged condition on July 22, 1898. The libels were tried together upon one record, and were dismissed. Each libelant appealed to this court.

Charles C. Burlingham, for appellant United States Leather Co.
Wilhelmus Mynderse, for appellants Wilder and others.
J. Parker Kirlin, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. In May, 1898, at Buenos Ayres, the steamship took on board 2,000 hides shipped to Weil Bros., which were stowed in the "spare bunker,"—a part of No. 2 lower hold par-

titioned off by a temporary wooden bulkhead, and sometimes used for carrying coal. At Rosario, from June 2d to June 4th, the steamer took on board 19,928 hides shipped to the United States Leather Company, which were stowed for the most part in No. 2, while a few were stowed in No. 3, and also took 2,500 hides of C. Moench & Son, which were stowed in No. 3, all in the lower hold. At Montevideo, on June 7th, the steamer took 20,000 hides consigned to the leather company, 10 bales of horse hair and 141 bales of glue stock consigned to Enos Wilder, and 2,088 hides and 13 bales of horse hair consigned to Oelrichs & Co. The Montevideo hides, glue stock, and hair were stowed in No. 2 and No. 3,—some in the lower hold and some in the between-decks. Upon reaching New York, 56 per cent. of the Weil hides, 6 per cent. of the leather company hides, 18 per cent. of the 4,588 hides shipped to the other consignees, 33 bales of glue stock, and 15 bales of horse hair were found to have been damaged. The bills of lading recited that the goods were shipped in apparent good order and condition. Each libel alleged that the damage was caused by sea water entering the ship through some defect or unfitness or by want of care in the custody, care, and delivery of the goods. The answers alleged as a defense:

"The provisions in the bill of lading, and which exempted the ship from the consequences of damage arising from sweating, natural decay, all damage or injury, while on board craft or in store. perils of the seas, rivers, or navigation, of whatever nature or kind soever. * * * and that the condition of the goods on arrival was the result of sweating, heat, or natural decay due to the inherent or natural condition of the goods, or latent dampness thereof due to the wetting in craft coming to the ship, or while in store or on shore, or to latent defects in the curing thereof. By an amendment to the answer, the claimant averred that the owners of the said vessel had used due diligence to make her seaworthy, and to have her properly outfitted and equipped for the voyage, and invoked the protection of the Harter act."

The damaged goods were either worthless or were materially injured, by entire or partial offensive decay; and the question of fact was whether this injury was owing to having been wetted by sea water on the voyage, or to heat and decay caused by wetness or insufficient curing before shipment. Upon this question the experts differed materially. On the part of the libelants, the experts urged that the mass of wetness which was manifest to them in the injured hides, and the destruction which it had caused, showed the presence of water in quantities, while an injury caused by the existence of dampness or incomplete drying after the usual arsenical bath before shipment universally manifests itself in a heat damage, which creates a hardness and stops the pores in the hide so that it will not absorb tan bark; but the witness for the libelants, of perhaps the largest experience and knowledge, said (what is obviously true) that a lot of hide put in the hold of a vessel in a very moist or thoroughly wet condition, and remaining there two months, would become rotten on the voyage. The experts for the claimants were of opinion that the damage was by the heating or fermentation, during an unusually long voyage in hot weather, of a portion of the hides, which had been either insufficiently cured, or had not been adequately dried after the arsenical bath, and pointed to the fact that hides damaged by sea

water are cold when taken from the hold, whereas it was substantially proved that the damaged hides in the Merida were hot and emitted steam. On the other hand, there is no evidence from those who handled the hides when they were received by the steamship of any manifestation of dampness, while there is testimony of care used in the inspection when they were stowed in the hold, and of their apparent dryness. In this conflict of opinions, it is important to ascertain whether the goods were in fact subjected on board the vessel to sea water, and, if they were, whether the water came from leaks, or from carelessness in the management of the vessel by officers or engineers. An effort was made to show leakage through a thin iron deck, either when the decks were washed or during storms, but without success. The voyage was without storms or unusual weather, and would have been uneventful were it not that after the vessel left Rio Janeiro yellow fever broke out, and three of the engineers died. At San Lucca, where the vessel stopped for coal, she was detained nine days in quarantine, so that the voyage was prolonged. The steamer's hull was also tight, as were also the iron between-decks, and after the arrival of the vessel in New York the existence of a supposed leak on the beams under the main deck, or of rusty stains, was clearly disproved. In discussing the probabilities of a leak through the main deck or the between-decks, the district judge commented upon the fact that there was no damage in the wings, where it would naturally have been the greatest from the rolling of the ship, and said that the damage was greatest in the lower half of the lower hold, in a space occupying from two to ten feet above the bottom, and not extending to the wings on either side, but confined mainly to the "heart of the ship." The expression "heart of the ship" is commented upon by the libelants as inaccurate, but it is evident that it was used with relation to the location of the severe damage. There was little or no damage in the wings. For a more precise statement of the location we adopt that given by Boyce, the head stevedore, whose opportunities for observation in No. 3 were abundant and were improved. He says that the damage in No. 3 lower hold was about nine or ten feet in breadth from the amidships to the side, and that the damage was greater four or five feet up from the bottom than on the bottom, and was from five to seven feet in thickness. The damage ran from the amidships to the wing, worse in the middle of the floor than it was near the wing, and commenced about eight feet below the between-decks. We hold, in accordance with the testimony of Hayes, the foreman stevedore, who says that the hides in the No. 2 between-decks were dry, that the damage did not begin until about ten feet below the between-decks, and that its area was about eight or nine feet long and about four or five feet wide, the forward part was three or four feet from the bulkhead, and ran back to the wooden bulkhead of the bunker, and that there was no damage in the extreme wings. The dunnage was from eight to ten inches upon a floor over the ballast tank. We agree with the district judge that there was little or no damage in the between-decks. No accumulation of bilge water could reach the hides, if any ordinary attention had been given to the soundings; and it is certain that the coffee, a sensitive cargo, was

stowed on the dunnage in No. 4, and reached New York in safety, though the ship was some feet by the stern from Rio to New York. The surviving engineer testifies that the different compartments were sounded daily to see if water was in them, and that there was no water in any of the holds during the voyage, except in the after well, in the extreme stern of the ship, where it was pumped out every four hours. There was no testimony in regard to an accumulation at the time of the removal of the cargo. The testimony in regard to water in the bilges ten days after the vessel arrived is not of weight. We concur with the district court that there was no damage by sea water through any leaks or imperfection of the ship, and are also of opinion that, if damage occurred from causes having their origin in the ship, it occurred through an accumulation of water in the bilges. If it did not occur from this cause, it was occasioned by an excess of moisture in some of the hides before shipment, which were closely stowed in the hold for an unusually long voyage. These hides became heated, decay followed, and the mischief spread. The ship was thoroughly equipped so as to remove an accumulation in the bilges, which nothing in the circumstances of the voyage rendered excessive. The existence of water from this source could have been easily ascertained, and the water could have been removed, for the sluices and pumps were in working order. It is possible that when three engineers were prostrate with yellow fever the ordinary precautions were neglected, but, if they were, the failure to make use of the pumps was a fault in the management of the vessel, with the result that the ship is exempted from liability by the provisions of the third section of the Harter act. The British King (D. C.) 89 Fed. 872; Id., 92 Fed. 1018, 35 C. C. A. 159.

Inasmuch as the claimants have shown affirmatively the facts which exempt the ship from liability, they were entitled to decrees in their favor. The decrees of the district court are affirmed, with costs.