### CORSAR v. J. D. SPRECKELS & BROS. CO.

### J. D. SPRECKELS & BROS. CO. v. CORSAR.

(Circuit Court of Appeals, Ninth Circuit. October 16, 1905.)

#### No. 1,167.

1. SHIPPING—DAMAGE TO CARGO—HARTER ACT.

A ship bound from Antwerp to San Francisco with a cargo of cement encountered such rough weather in attempting to round Cape Horn and was subjected to such strain that her deck seams opened and a part of the cargo was damaged by water. She finally abandoned the attempt and completed the voyage by way of the Cape of Good Hope and Australia. At the time of her change of course she was 370 miles distant from Port Stanley, where she could have been repaired; but she did not put in for repairs, and before she reached Australia the cargo received further damage by reason of the open seams. *Held*, that the

change of course and also the determination of the master to proceed without putting in for repairs were matters pertaining to the "navigation and management of the vessel," within Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946], and not to the custody, care, or proper delivery of the cargo, within the meaning of section 2, and that, assuming the vessel to have been in all respects seaworthy, and properly manned, equipped, and supplied at the beginning of the voyage, she was exempted by the act from liability for the damage caused or contributed to by the failure to repair.

[Ed. Note.—Statutory exemption of shipowners from liability, see note to Nord-Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11.]

2. SAME—LIABILITY OF SHIP.

If the jettison of cargo or damage thereto is rendered necessary by or due to any fault or breach of contract on the part of the owner or master of the vessel, the loss must be attributed to that cause, rather than to the sea peril, although that may enter into the case.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 445.]

3. SAME—SEAWORTHINESS—STOWAGE OF CARGO.

The requirement of seaworthiness at the beginning of a voyage includes, not only seaworthiness in hull and equipment, but also in the stowage of the cargo.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 449.]

4. SAME.

Evidence considered, and *held* to sustain a claim that a cargo of cement, to be carried from Antwerp to San Francisco by way of Cape Horn, was improperly stowed, which rendered the ship unseaworthy for the voyage and liable for loss and damage to cargo, a part of which was jettisoned and the remainder damaged by water.

5. SAME—RESPONSIBILITY FOR STOWAGE.

A ship is responsible for the proper stowage of her cargo, although the charter party gives the charterer the option of appointing the stevedores, to be paid by the owners, where it also provides that they shall be under the direction of the master and the owners responsible for all risks of loading and stowage.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 179.]

Gilbert, Circuit Judge, dissenting.

Appeal and Cross-Appeal from the District Court of the United States for the Northern District of California.

See 125 Fed. 786.

Page, McCutchen & Knight, for appellant.

Nathan H. Frank, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The ship Musselcrag, owned by C. W. Corsar, sailed from Antwerp on the 19th day of July, 1899, laden with a cargo of cement, and bound for San Francisco, which place was reached 315 days thereafter, whereas her voyage under ordinary conditions should not have exceeded 140 days. A part of the cargo was jettisoned on the way, and a part of it was badly damaged, resulting in this libel by its consignee, J. D. Spreckels & Bros. Company, by which the libelant seeks to recover $1,233 for the cement totally lost, and $11,500 for that damaged; the averments of the libel being that such loss and damage were occasioned by the unseaworthy condition of the vessel and the carelessness and negligence of her master. It appears that the

ship encountered such severe weather off Cape Horn that her master deemed it best to abandon his effort to round that cape and to shape his course for the Cape of Good Hope, which he did. At the time of doing so the ship was about 60 miles from Staten Island, and about 370 miles from Port Stanley, in the Falkland Islands.

On the trial it was contended on behalf of the libelant that the ship was unseaworthy for the voyage, because of the improper stowage of the cargo; that the primary cause of the loss complained of was such defective stowage; and, further, that when the master of the ship determined to abandon his effort to round Cape Horn, he was guilty of fault in not going, for the protection of the cargo, to Port Stanley, where it is conceded his vessel could have been repaired. The court below held that the ship was properly stowed and in every way seaworthy, from which decision the libelant appeals, but further held that it was liable in damages for the failure of the master to seek repairs at Port Stanley, and gave the libelant damages for such of the injury to the cement as it found was sustained by the failure of the master to seek refuge and repairs at Port Stanley, from which ruling the claimant appeals.

The conclusion of the court below in the latter respect was based upon the theory that there was a failure of duty on the part of the ship in the "custody, care, or proper delivery" of the cargo, as defined in section 2 of the Act of Congress of February 13, 1893, known as the "Harter Act" (27 Stat. 445, c. 105 [U. S. Comp. St. 1901, p. 2946]). The first section of that act provides that it shall be unlawful to insert in any bill of lading any agreement relieving the vessel or her owner from liability "for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge," and declaring all words and clauses of such import to be "null and void, and of no effect." The second section of the act makes it unlawful to insert in a bill of lading any agreement whereby the obligations of the owner of a vessel "to exercise due diligence, properly equip,  *  *  *  and to make said vessel seaworthy,  * * * or whereby the obligations of the master, officers, agents, or servants, to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided." Section 3 of the same act provides that if the owner "shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel." It will be thus seen that by virtue of the Harter act the ship is still held, as theretofore, responsible for loss or damage arising from negligence, fault, or failure in the proper custody, care, or delivery of the cargo, and at the same time is exonerated from damage or loss resulting from faults or errors in navigation or in the management of the vessel, where due diligence has been exercised to properly man, equip, and supply it, and to make it in all respects seaworthy. It will not do to so construe these provisions as to make them

nullify each other.   On the contrary, they must be so read as to give effect to each, if possible.

Undoubtedly a fault or error in the navigation or management of a vessel carrying cargo may, and often does, result in injury to the "custody, care and delivery" of the cargo.   And the very object of the act was, as said by the Supreme Court in the case of The Delaware, 161 U. S. 471, 16 Sup. Ct. 522, 40 L. Ed. 771, "to modify the relations previously existing between the vessel and her cargo." But, if the owner of the vessel has performed his duty by making the vessel in all respects seaworthy for the voyage it undertakes, it is plain that neither he nor the vessel can be held responsible for any merely incidental damage resulting to the cargo from a fault or error in its subsequent navigation or management, if section 3 of the act is to be given any force.   So in the case of The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241, where the portholes of the ship between decks were fitted with the usual glass covers and the usual iron shutters, with no cargo stowed against them, and capable of being speedily got at and closed if occasion should require, the Supreme Court held that the ship was not unseaworthy by reason of beginning her voyage in fair weather with the iron shutters left open for the admission of light—the glass covers being tightly closed—and that any subsequent neglect in not closing the iron shutters was a fault or error in navigation or in the management of the vessel, within the meaning of section 3 of the Harter act; the court sayng:

"This case does not require a comprehensive definition of the words 'navigation' and 'management' of a vessel, within the meaning of the act of Congress. They might not include stowage of cargo, not affecting the fitness of the ship to carry her cargo. But they do include, at the least, the control, during the voyage, of everything with which the vessel is equipped for the purpose of protecting her and her cargo against the inroad of the seas; and if there was any neglect in not closing the iron covers of the ports, it was a fault or error in the navigation or in the management of the ship. This view accords with the result of the English decisions upon the meaning of these words."

In the case in hand, the record shows that for about seven weeks the ship in question struggled with wind and wave in the effort to round Cape Horn, resulting in the carrying away of her sails, a part of her rigging, and the battering and exhausting of a number of her crew, in view of which conditions, and the continuation of the tempestuous weather, the master deemed it best to abandon the effort to round that cape, and to change his course for the Cape of Good Hope.   The question confronting him was primarily and essentially one of navigation —how best, in view of the trying circumstances in which he was placed, to deal with the elements and get his ship, with her crew and cargo, to the place of destination.   That his action in determining that question was primarily and essentially one of navigation, does not, in our opinion, admit of the slightest doubt; and, being such, neither the ship nor her owner is responsible for any incidental damage sustained by the cargo, because of the provision of the third section of the act of Congress above referred to.   The Germanic, 196 U. S. 597, 598, 25 Sup. Ct. 317, 49 L. Ed. 610.   See, also, The Merida, 107 Fed. 146, 46 C. C. A. 208;

The Viola (D. C.) 59 Fed. 632; Knott v. Botany Mills (D. C.) 76 Fed. 584; The Glenochil (1896) Prob. Div 10 Asp. N. S. 218.

There is nothing to the contrary in the decision of the Supreme Court in the case of Knott v. Botany Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90. On the contrary, the court in that case, as in the case of The Sylvia, supra, recognized the correctness of the construction put upon the first and third sections of the Harter act by Sir Francis Jeune, in The Glenochil, supra, to wit, that those sections may be reconciled by holding:

"First, that the act prevents exemptions in the case of direct want of care in respect to the cargo; and, secondly, the exemption permitted is in respect to a fault primarily connected with the navigation and management of the vessel, and not with the cargo."

We are, therefore, of opinion that if it be true, as the court below held, that the Musselcrag was in all respects seaworthy for the voyage she undertook at the time of entering upon it, neither the ship nor her owner was responsible for any part of the damage sustained by the cargo by reason of the action of the master in shaping his course for the Cape of Good Hope instead of going to Port Stanley. But, if the ship in question was not seaworthy for the voyage she undertook at the time of entering upon it, then, clearly, the libelant is entitled to recover for all of the loss and damage sustained. We therefore proceed to the consideration of that question.

The obligation upon the part of the ship to deliver the cement to the consignee at San Francisco in good order and well conditioned, excepted, among other things, "the perils of the sea." "Perils of the sea" was undoubtedly one of the causes for the jettison of the cement that was totally lost and for the wetting and consequent damage of the balance. But it is well settled, as said by the Supreme Court in the case of The Portsmouth, 9 Wall. 682, 19 L. Ed. 754, that:

"If a jettison of a cargo, or a part of it (and, as matter of course, damage thereto), is rendered necessary by any fault or breach of contract of the master or owners of the vessel, the jettison must be attributed to that fault, or breach of contract, rather than to the sea peril, though that may also be present and enter into the case. This is a principle alike applicable to exceptions in bills of lading and in policies of insurance. Though the peril of the sea may be nearer in time to the disaster, the efficient cause, without which the peril would not have been incurred, is regarded as the proximate cause of the loss. And there is, perhaps, greater reason for applying the rule to exceptions in contracts of common carriers than to those in policies of insurance; for, in general, negligence of the insured does not relieve an underwriter, while a common carrier may not, even by stipulation, relieve himself from the consequences of his own fault."

Now, the contract on the part of the ship required her to be in all respects seaworthy for the voyage she undertook. Indeed, unless otherwise expressly stipulated, an implied warranty of seaworthiness of the ship at the time of commencing the voyage accompanies every contract of affreightment. The Caledonia, 157 U. S. 130, 131, 15 Sup. Ct. 537, 39 L. Ed. 644. And this includes, not only a ship seaworthy in hull and equipment, which conditions it is conceded the Musselcrag met, but also seaworthy in respect to the stowage of the cargo. The Edwin I. Morrison, 153 U. S. 211, 14 Sup. Ct. 823, 38 L. Ed. 688; Carver on

Carriage by Sea, § 18; Sumner v. Caswell, (D. C.) 20 Fed. 249; The Colima (D. C.) 82 Fed. 665; The Whitlieburn (D. C.) 89 Fed. 526; The Oneida (D. C.) 108 Fed. 886; Id., 128 Fed. 687, 63 C. C. A. 239; The William Power (D. C.) 131 Fed. 136; The G. B. Boren (D. C.) 132 Fed. 887.

Was the Musselcrag seaworthy in respect to her stowage for the voyage undertaken at the time of entering upon it? We are of the opinion that the decided weight of the evidence is against the conclusion reached by the court below in respect to that question. It was admitted by the master that the Musselcrag was "naturally a very stiff ship." It is also shown, as well as commonly known, that cement is a heavy, compact cargo, and, unless properly distributed, will make the vessel in which it is stowed too stiff for safe navigation in severe weather, which, as a matter of course, is always to be anticipated off Cape Horn. Now, turning to the testimony, all of which that tended to show proper stowage was taken by deposition, we find that the testimony on the part of the ship, tending to show that the cargo was properly stowed, consists of that of two stevedores who assisted in the loading at Antwerp, and the testimony of the master, corroborated to some extent by that of the ship's carpenter. The testimony of the stevedores is very general in character, and is to the effect that, as they remember, the cargo was properly stowed. The master also testifies that it was properly stowed, gives (approximately) the number of tons put in the hold, the number placed between-decks, and goes somewhat into the details of the stowage. We extract from his testimony:

"Q. In stowing the cargo, was any precaution, and, if so, what precaution, taken for the purpose of making an allowance for a heavy, deadweight cargo? A. Yes, sir; the cargo was raised from the sixth tier up. Q. Will you explain what the difference is between raising a cargo in the hold, as you say, and not raising it? A. If we did not raise it, the barrels would be stowed bilge and cuntling. When you raise the cargo, you put inch pieces of board over the sixth tier, which would raise the next tier, and so on. Q. That is, when you begin raising at the sixth tier, do you lay the same scantling between each successive tiers? A. Yes, sir. Q. Up to the beams? A. Yes, sir. Q. What effect would that have in diminishing the occupied space in the hold? A. I should say by nearly a barrel when it got to the between-decks. Q. That is, the diameter of a barrel? A. Yes, sir. Q. Ordinarily, in stowing cargoes at Antwerp, where is this raising begun? A. At the eighth tier. Q. In the case of your ship, why did you begin at the sixth tier? A. I think the owners wished to keep the ship as lively as possible. The ship was naturally a beamy ship and a stiff ship. Q. What do you mean by a 'beamy' ship? A. A large beam. Q. Was the lower hold full? A. There was room for another cask between the beams. The ends of her were empty. Q. Were the between-decks full up to the beams? A. There was room for another tier. Q. How much did you have in the lower hold in weight? A. About 2,350. Q. How much did you have in the between-decks? A. We had 928 tons in the between-decks, as near as I could guess. Q. Under whose superintendence was the cargo loaded? A. Under mine. Q. In your judgment as a shipmaster, was that cargo properly stowed? A. Yes, sir. Q. With reference to the ship's carrying capacity, was the cargo a small cargo, or a large cargo, or a suitable cargo, or what? A. A suitable cargo. The ship was loaded to her marks. Q. When you say she was loaded to her marks, what do you mean? A. Light-water draught. Q. At the time that the ship was loaded, where was she laying? A. In the Scheldt, fresh water. Q. The effect of leaving the fresh water and going into the salt water would be what on raising or lowering those marks? A. It would raise

it six inches. Q. She would be lying six inches out of the water after leaving the fresh water than she was at that time? A. Yes, sir; six inches more free board. Q. In your judgment, what was the condition of the vessel then with reference to seaworthiness? A. Good condition; excellent condition."

On the part of the libelant one Burke, the head stevedore, who unloaded the cargo at San Francisco, testified as follows:

"Q. Do you remember the ship Musselcrag when she came into this harbor in June or July, 1900, with a damaged cargo of cement? A. Yes, sir. Q. Were you engaged at that time in the discharge of that cargo? A. Yes, sir. Q. What did her cargo consist of? A. It consisted of 100 tons of general merchandise, and the rest cement. Q. Do you remember how that cargo of cement was stowed in the lower hold, with reference to whether it was stowed bilge and cuntline or raised? A. It was set bilge and cuntline, raised on the bottom, I suppose, about a foot from the bottom of the ship. Q. I mean so far as the cargo itself is concerned, was it set solid? A. A solid bulk of cement. From the between-decks down there were a few boards scattered along the main hatch, and barrels were set on top of them; but from there aft, to both ends of the ship, there was nothing but cement, and it was set bilge and cuntline. Q. Did those boards have any tendency to raise the heads of the barrels so as to increase the liveliness of the ship? A. No, sir; I don't think so. The fourth tier below the between-decks was where the boards were. Q. What was the size of the boards? A. Old pieces of lining boards that they line ships with, perhaps 1 by 10 or 1 by 12, and perhaps 20 feet long. Q. Were those boards of sufficient strength to have ordinarily sustained the weight of three or four tiers of cement? A. I don't hardly think so. Q. Well, do you know? A. I think it is too much weight for an inch board to stand four tiers of cement. Q. What is the weight of a barrel of cement? A. Four hundred pounds, on an average. Q. So four tiers of it would be about 1,600 pounds? A. Yes, sir. Q. From what you saw of that cargo, could you tell whether or not it had been originally tiered up or raised from the sixth tier? A. No, sir; nothing raised that I saw. I think those few boards were on top of the sixth tier. Q. What would that indicate to you? Could you tell, from your experience, whether it had been originally raised, or whether it had been set solid? A. I could not tell whether they set it that way or threw those boards there. They were not all the way from the hatch that way. They were just in the body of the ship in the main hatch. Q. None of those boards were found anywhere, except around the main hatch? A. Around the main hatch; that is all I could find. Q. And how were the barrels stowed away there? Were they stowed as if they had been raised, or bilge and cuntline? A. They were set on those boards, and over those boards they were set bilge and cuntline again above. Q. What was the area of the main hatch compared with the spread of the cargo? A. About the size of the hatch, you mean? Q. Yes. A. I could not exactly say. It might have been four beams in length, and it might have been about 12 or 14 feet wide, and it might have been 16 feet long in the main hatch. Q. And it was stowed in what points? A. Stowed from the bulkhead forward to the foremast two tier high, and from the foremast half barrel shingle to the between-decks shingle from behind the mizzenmast to the between-decks below the mizzenmast in the lower hold. Nothing outside of cement, but a few crates of bottles and barrels of pulverized sulphur in the lower hold among the cement. Q. And in that cargo there was no indication of any raising of the cargo, except in this square around the main hatch? A. That is all that I know. Q. If it had been there, would you have seen it? A. I would, because I was looking down there all the time. I blowed a whistle for the engineer to go ahead. I have to look down to see that the load is slung right. * * * I took all her cargo out of her before I left. The last thing I took out of the ship was a load of firewood the captain gave me. That was the last thing that came out of the ship; some dunnage wood."

The latter witness was corroborated by the testimony of the stevedore Wilson, who was also employed in discharging the cargo at San Francisco. Besides which, two British shipmasters of long experience —Quayle and Steele—testified that in their opinion the cargo was not properly stowed; that too much of the cement was put in the lower hold as compared with that put between-decks, the direct consequence of which was to add to the natural stiffness of the ship, thereby causing her to roll and strain more than she should or would have done, had the proper amount of the cargo been stowed between-decks. All of these witnesses, so far as the record shows, were without interest in the controversy. Moreover, their testimony to the effect that the cargo was improperly stowed is sustained by, what the record shows actually happened on the voyage. The ship's log, as well as the testimony of some members of the crew, shows that no severe weather was encountered until the vicinity of the Horn was reached; yet it appears that the ship rolled and strained so badly on the way to the Horn that her seams started, causing leaks, and necessitating calking of the main decks, and, according to the log, "securing cargo lower, fore, and 'tween-decks." When the Horn was reached and the heavy gales were met, the seams gradually opened, letting in the water in large quantities. On October 12th, the log shows, the crew was "employed shifting cargo from fore part of forehold, and raising part into between-decks, and shifting cement further aft and higher in the ship, to ease the pitching and straining," the object and effect of which, according to the evidence, was to make the ship livelier and to ease her straining. That could and should have been done before sailing; for it is the duty of the carrier, as has been said, to provide a vessel not only seaworthy for the voyage undertaken in respect to hull and equipment, but also as regards the stowage of the cargo.

The suggestion on the part of the claimant that the stevedores employed at Antwerp were of the charterer's selection is without force, for the reason that while the charter party provided that the charterers should "have the option of appointing the lumpers and stevedores who are to take in and stow the cargo, who are to be paid by the owners one shilling per ton, weight measurement," it is by the same instrument "especially agreed that the lumpers and stevedores shall be under the direction of the master, and the owners responsible for all risks of loading and stowage." Under such circumstances, the ship is responsible for the bad stowage. The Sloga, 22 Fed. Cas. 346; The Whitlieburn (D. C.) 89 Fed. 527.

Upon the ground that the cargo was insufficiently stowed for the voyage undertaken, we are of the opinion that the libelant is entitled to recover the full amount of the loss and damage sustained, and the judgment must be modified accordingly.

Cause remanded to the court below, with directions to so modify the judgment as to award the libelant the full amount sued for, with costs.

GILBERT, Circuit Judge (dissenting). From that part of the opinion which holds that, upon the ground that the cargo was insufficiently stowed the libelant is entitled to recover the full amount of the loss and

damage sustained, I am compelled to dissent. In the first place, I find in the record no evidence sufficient to sustain a finding that improper stowage was the cause of or contributed to the damage to the cargo. The only witnesses who testified as experts upon that subject were the master mariners Quayle and Steele. Quayle said that in his opinion, taking the weather to be as described in the log book, "if the ship had been stowed with less cargo in the lower hold, she would not have come to so much damage as she did get." And he added:

"I do not put that forth as an opinion but what a ship might be damaged off the Horn; but, so far as I can see in this log book, she had no unusual weather off the Horn."

In brief, this witness inferred from reading the log book that the ship met no unusual weather off the Horn, and he was therefore of the opinion that improper stowage must have been the cause of a portion of the damage to her cargo. Steele, master mariner, from reading the log, testified that the weather was not unusual; "it is the ordinary course of the weather; * * * what is to be expected in coming around the Horn"; and that if, under those conditions, a vessel labored very heavily and strained herself, the conclusion he would come to was that she had too much cargo in her lower hold, and that he would attribute her injuries to her stowage, rather than to the weather.

But the evidence is convincing that the weather encountered off the Horn was unusual. For a period of about 50 days there were unusual gales. A large portion of that time the ship lay to the wind. Milne, an experienced seaman, said that the gales were very hard—as hard as he ever experienced. Lawson, the sail maker, testified that he had been 20 times around the Horn, and that on this occasion it was blowing the hardest he ever saw down there. Faraday, the second mate, testified that three or four different times he thought the ship would founder, the sea was so bad. Johnson, the master, testified that he had never seen such heavy weather off the Horn; that he thought on one or two occasions the ship would in all probability go down before morning. The evidence shows that the decks were almost continually flooded. Faraday said, "We were shipping tons of water all the time." It is not disputed that the ship lost a spanker boom; had her wheel smashed and steering gear boxes; lost two boats, three topsails, and two mizzen staysails; that her bulwarks were twisted, and her bulwark stanchions started, on both sides; that she lost a considerable amount of running gear, blocks, and that all the galley furnishings were washed completely out of the galley; that in order to protect the crew from accidents life lines were stretched fore and aft the decks and across the poop, and ladders from the amidship house to the mainmast; that at different times four or five of the men at a time were incapacitated from injuries received; and that about 450 barrels of cement were jettisoned. This weather would seem to be sufficient in itself to account for the straining of the decks and the injury to the cargo, and I submit that the evidence ought to be more convincing than it is before the court should say that improper stowage contributed to the damage.

In the second place, it must be remembered that the evidence of the witnesses who testified that the cargo was improperly stowed was all

taken in open court, and therefore the rule is applicable that the finding of the district judge upon the conflicting evidence must be taken to be conclusive upon that question of fact, unless it clearly appears to be against the evidence. Whitney v. Olsen, 108 Fed. 292, 47 C. C. A. 331; Jacobsen v. Lewis Klondike Expedition Co., 112 Fed. 73, 50 C. C. A. 121; The Newport News, 105 Fed. 389, 44 C. C. A. 541; Alaska Packers' Ass'n v. Domenico, 117 Fed. 99, 54 C. C. A. 485; Elphicke v. White Line Towing Co., 106 Fed. 945, 46 C. C. A. 56. The district judge may well have failed to give full credence to the testimony of Burke, the stevedore, who testified as to the stowage of a cargo which he had helped unload more than four years prior to the time of giving his testimony. His testimony as to the absence of boards interlining the barrels of cement above the sixth tier, and tending to contradict the explicit testimony of the captain, is as follows:

He said that the cargo was a solid bulk of cement. "From the between-decks down there were a few boards scattered along the main hatch, and barrels were set on top of them, but from there aft and to both ends of the ship, there was nothing but cement, and it was set bilge and cuntline. Q. From what you saw of that cargo, could you tell whether or not it had been originally tiered up or raised from the sixth tier? A. No, sir; nothing raised that I saw. I think those few boards were on top of the sixth tier. Q. None of those boards were found anywhere, except around the main hatch? A. Around the main hatch; that is all I could find. Q. And in that cargo there was no indication of any raising of the cargo, except in this square around the main hatch? A. That is all that I know. Q. If it had been there, would you have seen it? A. I would, because I was looking down there all the time. I blowed a whistle for the engineer to go ahead. I have to look down to see that the load is slung right."

But it does not appear that his attention was at the time particularly directed to the subject of the boards. He said that he was down below several times to look after the men, but his place was on deck as hatch tender, and it was his duty to blow the whistle for the engineer to go ahead. This testimony was not very direct, positive, or satisfactory, and is clearly insufficient, I think, to justify the court in reversing the finding of the district judge before whom the witness appeared and testified.

Similar criticism is applicable to the evidence furnished by the expert witnesses, who testified after the result and from an inspection of the log. That Quayle did not read the log very closely is amply shown by his cross-examination. The ship carried 2,350 tons in the lower hold, and 928 tons in the between-decks; or, in other words, $71\frac{1}{2}$ per cent. was in the lower hold. Quayle said that she should have had no more than 64 per cent. in the lower hold. Wilson, the stevedore, differed from this estimate, and said that she had only about 150 or 200 tons too much in the lower hold. I submit that such evidence is not sufficient to show that the master of the ship committed an error of judgment in causing the cargo to be loaded as it was. A ship should not be pronounced unseaworthy as to her cargo from a consideration of the result alone. If, upon all the evidence, no negligence is discoverable, the damage should be set down to the perils of the sea, when, as in this case, perils are proven which are sufficient to account for it. In The Frey, 106 Fed. 319, 45 C. C. A. 309, the contention was made that the excessive roll-

ing of the vessel was ascribable to the method of the distribution of the cargo in loading, and that certain drums of glycerine ought not to have been laden in the between-decks, or, if laden there, more weight of cargo or of ballast should have been laden above it, to make the vessel easy. The Circuit Court of Appeals for the Second Circuit, said:

"The judgment of the master and officers as to the proper trim of the ship and the proper distribution of the cargo and weights is much more valuable than that of the witnesses who expressed opinions in answer to hypothetical questions. The former were acquainted by experience with the characteristics of the ship, and, as is well known, two ships built on the same lines act differently under similar conditions of wind and sea. * * * The case for the libelants rests almost wholly on the theory that the weather was not extraordinary, and the consequent inference either that the drums were not properly stowed to resist the rolling of the vessel, or that the weights were not distributed as they should have been to prevent unnecessary rolling of the vessel. We think the seas were sufficiently violent to account for the disaster to a vessel in seaworthy trim with her cargo sufficiently secured. There is no rule by which it can be defined with accuracy what degree of violence of the wind or waves is necessary to constitute a peril of the sea. Different cases must be determined according to their special circumstances. The term, of course, refers only to such forces of the elements as cannot be resisted by the ordinary exertions of human skill and prudence."