### KNOHR & BURCHARD v. PACIFIC CREOSOTING CO.

(District Court, W. D. Washington, N. D.   August 26, 1910.)

#### No. 3,837.

1. SHIPPING (§ 123*)—RESPONSIBILITY FOR STOWAGE—EFFECT OF PROVISIONS OF CHARTER PARTY.

   A ship is responsible for proper stowage of her cargo, although the charter party gave a representative of the charterer the right to select the stevedores for loading, which fact did not deprive the master of his

authority to control the manner of stowage, nor affect the warranty of seaworthiness, which includes proper stowage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 454, 455, 466; Dec. Dig. § 123.*]

2. SHIPPING (§ 123*)—INJURY TO CARGO—LIABILITY OF VESSEL—IMPROPER STOWAGE.

A contract for the carriage of a cargo of creosote oil in iron drums from Liverpool to Eagle Harbor, Wash., as evidenced by the charter party and bill of lading, warranted the seaworthiness of the ship, specified that she should load in a customary manner, that all liability of the charterer should cease on completion of loading, and payment of advance if required, admitted the receipt of the cargo in good order, and obligated the carrier to deliver it in like good order, subject to the usual exceptions of loss by perils of the sea, etc. In the vicinity of Cape Horn, the vessel encountered bad weather, and in a heavy gale was thrown on her beam ends and a part of the cargo in the between decks was dislodged, drums there stowed and in the upper tier in the hold were injured by chafing, straining, and bruising, and the contents spilled and lost. The ship made the voyage safely, and no damage to the cargo was caused by any exposure to the direct action of the elements. It was shown that such drums could be stowed so as to remain secure in the rough weather, which was to be expected in rounding the Horn. *Held*, that the damage was due to improper stowage, and that the ship was liable therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 454–455; Dec. Dig. § 123.*]

In Admiralty. Suit by Knohr & Burchard against the Pacific Creosoting Company, and cross-libel by respondent. Decree for respondent.

Bogle & Spooner, for libelants.
Ira A. Campbell and Bruce C. Shorts, for respondent.

HANFORD, District Judge. This is a suit in personam to recover the freight charges for transportation of a cargo consisting of 4,739 iron drums containing creosote oil in the ship Jupiter from Liverpool to Eagle Harbor, in this state. The consignee of the cargo resists payment of freight, and by a cross-libel has pleaded a counterclaim for damage to the cargo in transit and for short delivery. In the vicinity of Cape Horn, the ship encountered bad weather, and in a heavy gale she was thrown on her beam ends, and part of the cargo between decks was dislodged, and a number of the drums were so damaged as to spill the oil, and others lost their contents by plugs working loose. Most of the spillage was pumped out of the ship and wasted, so that, when the cargo was discharged at Eagle Harbor, there was a shortage of 51,321 imperial gallons, worth $2,800, and 1,220 drums were damaged, and 272 drums were completely ruined. These drums have a market value of $5.50. Those damaged were worth not more than the gross sum of $854, leaving a loss of $7,352 for damage to drums. The ship's bill for freight amounts to £2343, 15s., on which interest is claimed. The issues to be decided are whether the damage was a consequence of bad stowage of the cargo, and whether responsibility for the fault, if any, of bad stowage rests upon the libelants.

The drums are the usual iron oil drums encircled with two thick

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

iron bands; the weight of each drum and contents being about 1,000 pounds. The system of stowage in the lower hold was to lay the drums snug together in tiers with chocks and dunnage to keep them from chafing. On top of the first layer scantlings were placed upon which the second layer rested. Five layers or tiers were placed in like manner with dunnage placed between the drums and the sides of the ship and all spaces filled. The vertical space from the tween deck up to the main deck was not sufficient to admit three layers of drums, each resting on scantlings, as in the hold below, and, in order to get in a larger number than would otherwise have been practicable, the first layer on the floor was spaced and the second layer was laid fitting into the valleys, and the third tier was placed on scantlings resting on the second tier, and all vacant spaces between and around the drums, as thus placed, were filled with dunnage, but the wedging was not sufficient to prevent displacement of some of the drums when the ship was laboring in tempestuous weather, and the resulting damage. .

The contract for transportation of the cargo, evidenced by the charter party and bill of lading, warrants the seaworthiness of the ship, specifies that she should load the cargo in a customary manner; that all liability of the charterer should cease on completion of loading and payment of advance if required; that the captain should have a lien on the cargo for freight and any demurrage for delay in discharging, admits that the cargo was received in good order and well conditioned and obligated the carrier to deliver it in like good order and well conditioned at Eagle Harbor subject to exceptions of liability for damages caused by "the act of God, perils of the sea, fire, barratry of the master and crew, enemies, pirates, assailing thieves, arrest and restraint of princes, rulers, and people, collisions, strandings, and other accidents of navigation excepted, even when occasioned by the negligence, default, or error in judgment of pilots, masters, mariners, or other servants of the shipowners."

It is claimed, however, that the ship and owners were relieved from responsibility for bad stowage, by reason of the facts that the charter party provides that Messrs. Andrew Weir & Company should have the nomination of the stevedore to stow the cargo, and that said firm did select the stevedore. The mere selection, however, of the stevedore, did not deprive the captain of his authority to control the operation of loading, and to insist upon stowage satisfactory to him, and the evidence proves that the stevedores worked under the supervision of a marine surveyor employed by the captain and that the system of stowing between decks was agreed to by the captain, his marine surveyor, the stevedore and a representative of Andrew Weir & Co. This evidence certainly leaves the responsibility for stowage upon the captain of the ship where it usually rests. Corsar v. J. D. Spreckels & Bros. Co., 141 Fed. 260, 72 C. C. A. 378. The firm of Andrew Weir & Co. acted as a go-between in negotiating the contract for hiring of the ship. The original charter party is between Knohr & Burchard, agents for owner of the ship, and Andrew Weir & Co., acting for Blagden, Waugh & Co.; the latter named firm being the vendors of the cargo and charterers in fact, and the court holds that their responsibility, as well as the responsibility of Andrew Weir & Co. terminated when the

cargo was completely loaded as provided by a clause in the charter party, and that the respondent and·cross-libelant by purchase of the bill of lading became entitled to rely upon the warranty of seaworthiness of the ship which includes proper stowage of the cargo. "In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence." The Edwin L. Morrison, 153 U. S. 210, 14 Sup. Ct. 825 (38 L. Ed. 688).

Ships necessarily roll and plunge in the troubled waters and gales to be expected and usually encountered in the vicinity of Cape Horn, and to fulfill the carrier's obligation cargoes must be stowed securely to stay as placed. Notwithstanding the testimony of expert witnesses, the physical facts of this case prove conclusively that there is a right way to stow iron drums in a ship so that they will not be injured by the mere labor of a ship strong enough to protect them from external violence. The Jupiter was stanch and strong. She made a gallant fight against the elements, and her safe arrival at her port of destination proves the excellent seamanship of her captain and crew. The damage to her cargo was not caused by any exposure to the direct effect of the elements. The greatest weight was sustained by the drums in the lowest tiers of the lower hold of the ship, and they were not crushed nor damaged. All of the damaged drums were in the top tier of the lower hold and between decks, and the damage was caused by chafing, straining, and bruising, which could not have happened if the wedging had been sufficient and carefully placed, and, if the first and second tiers in the tween deck space had been separated by scantlings, so as to prevent the bands on the drums in each tier from chafing the drum bodies. The rule of law defining the liability of a shipowner with respect to the cargo, where the whole carrying capacity of the ship has been hired for a voyage, is well stated in the written argument in behalf of the libelants as follows:

"If the whole ship is chartered by the owner to a single person for a particular voyage out and home, for a specified freight, under a charter party, the charter party will be held to regulate the rights, duties, and responsibilities of the parties, and supersede those of the shipowner, as a common carrier. Angell Car. (5th Ed.) § 89."

The contract set forth in the charter party and bill of lading takes the case out of the law applicable to mere bailees for hire as well as the rules applicable to common carriers, and the parties must be held to performance of the obligations assumed, as in other cases where parties to contracts stipulate to do or not do any particular thing for a consideration. By this contract the shipowner not only relieved the charterer from responsibility, but also admitted that the cargo had been received in good order and undertook to deliver it in like good order, and well conditioned, at Eagle Harbor, and specified the conditions which should exempt it from liability for loss or damage. Therefore

the burden of proof rests upon the libelants to prove affirmatively that the damage was a consequence of one or the other of the specified causes, viz.: The act of God, perils of the sea, barratry of the master and crew, enemies, pirates, assailing thieves, arrest and restraint of princes, rulers, and people, collisions, strandings, or other accidents of navigation. 7. Am. & Eng. Enc. of Law (2d Ed.) 229. The damage cannot be attributed to an act of God, perils of the sea, nor to accidents of navigation, because the storms which the vessel survived would not have harmed the cargo if it had been well stowed. The libelants having failed to deliver the cargo undamaged and failed to prove the loss to have been a consequence of either of the conditions in the exemption clauses of the contract, their liability must be held to be absolute.

The freight stipulated for in the charter party is at the rate of 18s., 9d., per ton, on 2,500 tons guaranteed by the charterer, with a proportionate deduction for short delivery. Therefore, after deducting $928.25 for 162 tons of creosote wasted, the freight earned amounts to $10,462.50. From this amount, a partial payment of $600 is to be subtracted, leaving a balance of $9,862.50 to be set off against the total damages which the court finds to be $10,152. The court directs that a decree be entered in favor of the respondent and cross-libelant for the difference amounting to the sum of $289.50 and costs.