## THE KAUPANGER.

(District Court, S. D. New York.   April 2, 1917.)

1. SHIPPING ⊕⟶42—CHARTERS—CARGO CAPACITY OF VESSEL.
    A steamer built on finer lines than usual, so as to render her tenderer than other vessels of her class, is not liable to a time charterer for inability to take a weather deck cargo, although the charterer is entitled to "the whole reach of the vessel's holds, decks, and usual places of loading," unless she is allowed the necessary additional ballast.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 156–164.]

2. SHIPPING ⊕⟶42—CHARTERS—DUTY OF LOADING AND BALLASTING.
    The duty of loading and of paying the cost of ballast rests upon the ship unless assumed by the charterer.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 156–164.]

3. SHIPPING ⊕⟶42—CHARTERS—RIGHTS AND LIABILITIES OF PARTIES—LOSS OF CARGO SPACE.
    Under the terms of a time charter, the charterer appointed a supercargo who by its direction assumed charge of the loading. When a part of the cargo of baled hay had been loaded and when proceeding to another port for the remainder the supercargo sought the advice of the master as to whether they could safely take on a deck load, and was told that they could, but when her upper or cattle deck was being loaded, the vessel listed, and was obliged to sail short of her cargo capacity. *Held* that, while the charterer would otherwise have been responsible for the loading, the owner was responsible for the advice given by the master that the deck could safely be loaded, which the supercargo had a right to rely on, and was likewise liable for the loss of space if it was practicable at that time to make use of it by putting in additional ballast.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 156–164.]

In Admiralty. Suit by Actieselskabet Kaupanger against Marden, Orth & Hastings Company for charter, hire, and cross-libel for loss of cargo space.   Interlocutory decree, with reference.

Libel for hire of the steamship Kaupanger on a time charter party. The charterers counterclaim for loss of a part of the ship's holds, and also seek to defend against the hire and the owner's damages after withdrawal. The charter party was made on May 15, 1915, for two round trips United States to France not north of Brest, of the ship, Kaupanger, dead weight 4,800 tons, to be placed at the disposal of the charterers at New York. The only relevant provisions of the charter are clause 8, "that the whole reach of the vessel's

holds, decks and usual places of loading should be at the charterer's disposal," and clause 11, "that the charterers shall have permission to appoint a super-cargo, who shall accompany the steamer and see that the voyages are prose-cuted with the utmost dispatch."

When chartered the owners knew the charterers meant to load with a cargo of hay at Texas ports, and the steamer was at once ordered to Galveston, stopping on the way at Norfolk, likewise at the charterer's orders, to load with bunker coals. Owing to the high price of coals in France, she filled not only her bunkers, but her deep water tank and the orlop deck and between deck above of hold No. 3.

At Galveston she partly filled with baled hay, a light cargo, and later went to Texas City, where the loading was continued. Some dispute at the trial arose as to whether the Galveston or Texas City hay was more closely baled, but the fact is that the Galveston hay was the heavier. As the loading, which was under the direct charge of the charterer's supercargo, or agent, Gilbert, proceeded and the cattle deck was filling, the Kaupanger took a heavy list, which required the cargo to be shifted. After some difficulty she was righted, and sailed with an underwriters' permit about 1,000 tons short of her proper dead weight capacity and with most of her cattle deck empty.

The Kaupanger had three holds, a hold proper, a between decks, and an upper, or cattle, deck, in this last respect differing from the usual vessel of her class. She had been made over for the cattle business by the addition of the upper deck or hold. It was this upper deck which was empty when she sailed, and of course she carried no deck cargo proper. She was of mark-edly finer lines than the usual tramp steamer, having a sharp fore foot, little water ballast, and a long run aft, all of which gave her an extra knot of speed. These lines, coupled with her greater depth, made her tenderer than similar ships. Other ships reached France safely from Galveston and Texas City loaded with nothing but hay, and carrying deck cargoes 15 or 20 feet high, but they were of the common blunt lines of the tramp steamer of commerce.

Haight, Sandford & Smith, of New York City (Clarence B. Smith, of New York City, of counsel), for owners.

Kirlin, Woolsey & Hickox, of New York City (John M. Woolsey and Mark W. Maclay, Jr., both of New York City, of counsel), for charterers.

LEARNED HAND, District Judge (after stating the facts as above). [1] The confusion in this case arises, I think, from a failure to distinguish between the volume and the weight of the cargo. The ship was built to fill her holds and decks, "all the reach of the vessel's holds, decks and usual places of loading and accommodation." Her water ballast should have been enough to hold her stiff if she filled even her cattle deck with any homogeneous cargo which did not set her below her marks. If she was tender before she filled the cattle deck, so that added ballast was necessary, the charterer would be deprived of the space occupied by the added ballast, and could set off for it. If she was stiff when allowed her water ballast, there was no breach of warranty. Clearly, she was not to be held liable if she became tender when loaded with a deck cargo, and not given any added ballast. Were the obligation otherwise, a charterer might insist upon loading a deck cargo 20 feet high and filling the holds as well. The ship was not so designed, and the charterer had no reason to suppose that she was. Even if the weather deck be among "the usual places of loading," to which he is entitled, he is not entitled to use it without added ballast.

Therefore there is no breach of warranty unless the Kaupanger could not have filled her cattle deck, although she had been allowed her deep water tank and had not been required to carry any return coals. If it was necessary to carry added ballast in order to fill, the charterer is entitled to damages for the space occupied by such ballast. As this

is probably a trifling matter, the real crux of the case arises upon the obligation for proper stowage.

The Kaupanger was in fact not allowed her water ballast; her deep tank and the orlop and between decks were filled with coals, which are lighter than water and heavier than hay. This at the outset upset her designed stability. Besides, to lift her dead weight in hay a deck cargo was necessary, which required an additional adjustment. Obviously, therefore, there was need of added ballast in the bilges, if the Kaupanger was to be economically stowed, and this could have been arranged for only at Galveston, when she began to load, or even earlier.

[2] It is the ship's duty to load. Munson S. S. Co. v. Glasgow S. S. Co., 235 Fed. 64, 67, 148 C. C. A. 558. It is even her duty to pay for the cost of ballast. Weir & Co. v. Union S. S. Co., Ltd., 5 Com. Cas. 24, 363. Yet this duty depends only upon the presumption from the original custom, when the ship's crew stowed and discharged; it may, of course, devolve upon the charterer by his assuming it (The Centurion [D. C.] 57 Fed. 412; The Diadem, 4 Ben. 247, Fed. Cas. No. 3,875 [obiter]), either before or after the charter party itself. The English courts especially have gone a long way in recognizing such a devolution of duty and in imposing upon the charterer the consequences of stowage undertaken by him. The leading case is Blaikie v. Stembridge, 6 C. B. (N. S.) 894, which eventually went to the Exchequer Chamber, and in which the shipper sued the master under a charter party containing the words, "Stevedore for outward cargo to be appointed by charterer, but to be paid by and to act under captain's orders." It was held that the charter imposed upon the charterer the risk of damage from loading certain sugar pans taken on board. In Swainston v. Garrick, L. J. (1833) 2 Ex. 255, the charterer by a subsequent oral agreement undertook the stowage, and the master was exonerated. In The Catherine Chalmers, 32 L. T. 847, the phrase in the charter party, "to be stowed by the charterer's stevedore at the risk and expense of the vessel," excused the ship for bad stowage. In Ohrloff v. Briscall, 4 Moore's P. C. (N. S.) 70, the charter party said that the charterers might appoint a stevedore at the expense and under the inspection and responsibility of the master for proper stowage. An assignee of a bill of lading sued the owner for damages caused by bad stowage, but was defeated because the charterers from whom the assignee held his bill of lading had constant access while the loading went on and made no complaint. The case is certainly an extreme one, but it was none the less the decision of the Privy Council. Cases like Corsar v. J. D. Spreckels & Bros. Co., 141 Fed. 260, 72 C. C. A. 378, Sack v. Ford, 13 C. B. (N. S.) 90, and Harris v. Best Ryley & Co., 7 Asp. M. C. 272, depend upon words in the charter party which expressly impose responsibility upon the owner notwithstanding the charterer's right to appoint. Similar to Ohrloff v. Briscall, supra, is a decision of Tindal, C. J., at nisi prius under facts not unlike those now at bar. Hovill v. Stephausen, 4 Car. & P. 469. The action was for failure to take a full cargo, both because of the wrong position of a partition and because certain added ballast was not necessary. The charterers' knowledge of both these facts was held to conclude them from

complaint, though no one even suggested that the original fault was not the master's.

[3] In the case at bar, the charterers had the right to appoint a supercargo, and they did so. Gilbert, their appointee, had the right under the charter party to see that voyages were prosecuted with the utmost despatch, and they in fact directed him to superintend and take charge of the whole loading. This the master, Jonassen, swears to, and it is nowhere denied. Under Ohrloff v. Briscall, supra, and Hovill v. Stephausen, supra, Gilbert's mere presence at the loading and the implied consent arising from it would have been enough to bar him from complaint, but the facts are much stronger. Only two circumstances can be thought to make a difference: First, that the master stowed the coals where he chose; and, second, the master's advice and the consequent preparations for a deck cargo at Texas City. As to the first, Gilbert knew, or could have known, at Galveston where the coals were stowed. The only evidence is that they could not have been put else-where without hurting the cargo; I agree with the reasonableness of this judgment. Being there, Gilbert, when he undertook to load, should have been guided by their presence and position. If she required more ballast, then was the time to add it. As to the preparations at Texas City for a deck cargo, the first mention of it was when the ship was leaving Galveston and was two-thirds loaded, as Gilbert thinks—perhaps it would have been truer to say only about one-half loaded. Gilbert then asked the master whether they could load a deck cargo, and Jonassen gave his assent. I think it fair to say that in so doing, he also gave his assent to the stowage already made, and in effect assured Gilbert that she might fill as she was even to her deck cargo. If he had not done so, but had said that she could not even fill her cattle deck, to say nothing of a deck cargo, what course was open to Gilbert? He could have discharged the cargo which he had, added the necessary ballast and refilled, and this he probably would have done if the cost of discharge and refilling, including demurrage, had been less than the value to him of the space which he would otherwise have lost.

While the master owed no duty in stowing the cargo, so long as the charterer assumed to stow even voluntarily, still the owners had not relieved themselves by a contract binding on the charterer, and the charterer had the right at will to impose the whole or any part of that duty upon the vessel, subject, of course, to the results of what they had themselves already done. When Gilbert consulted with the master and in substance got his assurance that he could fill the ship on top of the stowage as it stood, he had the right to sound advice, which would have told him that she needed more ballast. The master's unsound advice was a fault, for the loss through which the owner is responsible to the extent of the subsequent failure to fill up to her capacity.

It will be urged that Gilbert's knowledge of the existing facts would bar any recovery in any event under Ohrloff v. Briscall, supra, and Hovill v. Stephausen, supra. So it would if the facts were such that the parties stood in an equality, but they did not. So long as the char-

terers undertook to load without consulting the master, they acted necessarily on their own responsibility, but when, abandoning that course, they asked counsel of the master, to which they were entitled, as I have said, they came to one who they had the right to suppose knew more of the facts than they. The Kaupanger was his ship, not theirs; the subject-matter of their inquiry was one in which he was skilled and expert and in which they could not be, at least not in any such sense as he must have been. Therefore the parties in respect of such advice did not stand on an equality, and their knowledge did not bar them.

I shall therefore dispose of the case as follows: The charterer may prove if it can what added ballast would have been necessary to hold the ship stiff, when loaded with hay up to the shelter deck. The room of such ballast is a counterclaim. Further, it may prove that, had the true facts been disclosed at Texas City (whether the master knew them or not is of no consequence), it would have in fact discharged the Galveston cargo, ballasted the ship, and refilled up to the Kaupanger's capacity. If it proves that, its damages will be the actual loss of space from failure to carry that capacity. Any space for added ballast necessary for a deck cargo, or because return coals were carried, will be on the charterer's account, in such an estimate of lost space. The Kaupanger's capacity will be estimated by filling all the holds below the shelter deck, and adding such deck cargo as the underwriters would have allowed, assuming all necessary added ballast to have been taken in at the beginning. This capacity in no event will have any relation to her dead weight tonnage, except that it cannot exceed it.

The usual interlocutory decree will pass to settle these questions.