ELPHICKE et al. v. WHITE LINE TOWING CO.

WHITE LINE TOWING CO. v. ELPHICKE et al.

(Circuit Court of Appeals, Eighth Circuit. March 14, 1901.)

No. 1,465.

1. Court of Admiralty—Finding of Fact Presumptively Correct.
    A finding of fact by a court of admiralty upon conflicting evidence will not be reversed or modified by an appellate court unless there is a clear preponderance of evidence against it.
2. Agreement for Compensation by the Day for Salvage Services Enforceable.
    A contract by one party to pay at all events, and by the other to receive a fixed or deserved compensation for salvage services, is as conclusive and enforceable as any other valid contract.
3. Same—Burden of Proof.
    The burden of establishing such an agreement by a fair preponderance of evidence is upon the owners or claimants of the vessel or cargo who allege it.

(Syllabus by the Court.)

Appeals from the District Court of the United States for the District of Minnesota.

H. R. Spencer (F. E. Searle, on the brief), for C. W. Elphicke and others.

Theo. Hollister (H. J. Grannis, on the brief), for White Line Towing Company.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. On the night of November 22, 1898, the steamship Arthur Orr, laden with flour, copper, and shingles, was driven upon the rocky shore of Lake Superior, near the mouth of the Baptism river, so disabled that she sank. The White Line Towing Company and the Inman Tug Company, two corporations engaged in towing and assisting vessels upon the Great Lakes, found her at this place only partially submerged, took a portion of her cargo to Duluth on barges, and then raised and towed her to the same port. Each of these corporations furnished the services of tugs, barges, pumps, diving outfits, and men in the performance of this undertaking. The Inman Tug Company furnished its services under a contract made with the agent of the owners of the steamship about November 24, 1898, before it entered upon the undertaking to supply its tugs, barges, pumps, and other apparatus, for reasonable compensation by the day, and it has been paid according to this agreement. The White Line Towing Company and

the captains of its tugs libeled the vessel and cargo, and the court below found that this company was entitled to recover $3,000 salvage of the steamship and $7,500 salvage of the cargo. A decree was accordingly rendered against the claimants of the vessel and cargo, C. W. Elphicke and others, and their sureties, for these amounts, and both parties appealed from this decree. The claimants insist that the court below was in error because it failed to find from the evidence that the towing company agreed to render its services for a per diem compensation not exceeding the agreed rate between the agent of the steamship and the Inman Tug Company, and because it did not also find that the towing company had been guilty of embezzlement of a portion of the cargo, and had been so negligent in the care of it that it was entitled to neither salvage nor compensation. The libelants urging their appeal maintain that the court was in error because it did not find that the towing company was entitled to salvage to the amount of $20,000, instead of to the amount of $10,500.

The specifications of the parties assail the findings of fact of the court below, which are based upon contradictory evidence, and they cannot prevail unless they are sustained by a clear preponderance of the testimony. A finding of fact by a court of admiralty upon conflicting evidence will not be reversed or modified by an appellate court unless there is a clear preponderance of evidence against it. The City of Naples, 69 Fed. 794, 796, 16 C. C. A. 421, 424, 32 U. S. App. 613, 619; The Grafton, 1 Blatchf. 173, Fed. Cas. No. 5,655; Post v. Steamship Co. (C. C.) 48 Fed. 565; The Jersey City, 51 Fed. 527, 2 C. C. A. 365, 1 U. S. App. 244; Levy v. The Thomas Melville (C. C.) 37 Fed. 272; The Saratoga (C. C.) 40 Fed. 509.

The first question for consideration in this case is whether the towing company furnished the services of its tugs, barges, machinery, and men for salvage or for compensation by the day. The steamship lay in such danger, and the services rendered were so timely and efficient, that there is no doubt that the company was entitled to salvage in the absence of a contract for other compensation. The claimants alleged in their answer, and they produced evidence tending to prove, that the towing company agreed to render its services for compensation of the same character and at the same rate that others who were employed in rescuing the vessel were to receive; and that the Inman Tug Company, which was the only party which rendered similar services, agreed to receive, and was paid, the customary compensation by the day. The towing company denied these averments, and produced testimony which contradicted this evidence. The burden of establishing the agreement by a fair preponderance of evidence was upon the claimants. But a fair contract by one party to pay at all events, and by the other to receive, a fixed or a reasonable compensation for salvage services, is as conclusive and enforceable as any other valid contract. The Elfrida, 172 U. S. 186, 192, 196, 19 Sup. Ct. 146, 43 L. Ed. 413; The Comanche, 8 Wall. 448, 477, 19 L. Ed. 397; Post v. Jones, 19 How. 150, 160, 15 L. Ed. 618; The Helen and George, Swab. 368; The

Roanoke (D. C.) 50 Fed. 574, 576; The Emulous, 8 Fed. Cas. 704, 706 (No. 4,480); The Independence, 13 Fed. Cas. 9, 10 (No. 7,014); Harley v. Bars of Iron, 11 Fed. Cas. 525, 526 (No. 6,068); The Delambre (C. C.) 9 Fed. 775, 776. There are three methods of compensation for salvage services. They are: (1) By a share of the salvage in cases where the services are voluntarily rendered, and there is no express contract; (2) by the payment of an agreed compensation in case of success only; and (3) by the payment at all events of an agreed compensation, or a quantum meruerunt, under a contract to that effect. The third is the common and customary method upon the Great Lakes. The Elfrida, 172 U. S. 192, 19 Sup. Ct. 146. 43 L. Ed. 413. There is, therefore, nothing strange or improbable in the contract which the claimants allege was made with the towing company, to the effect that it would render its services for the same reasonable compensation by the day that the agent of the steamship and of its owners agreed to pay to other wreckers who furnished like assistance. On the other hand, such an agreement was the customary and probable contract under which such services were usually rendered at the place where, and under the circumstances in which, these parties found themselves.

When the towing company first appeared upon the scene, the steamship was in no great extremity, in no danger of immediate destruction or loss. She had lain quietly on the shore for 36 hours, and her master had already engaged the manager of the Inman Tug Line to go to Duluth, a distance of 56 miles, to report her condition to her agent there, to act under his direction, and to return, if possible, with a wrecking outfit to relieve her. It was about 2 o'clock on the morning of November 23, 1898, that this steamship was cast upon the shore and sank in shallow water. In the afternoon of that day B. B. Inman, the manager of the Inman Tug Company, then in command of one of its tugs, went to the steamship, and her master, Capt. Orville Green, engaged him to proceed at once to Duluth to make this report and obtain this aid. He went, arrived in Duluth on the night of November 23d or the morning of November 24th, reported to the agent of the owners of the steamship, and agreed with him that he would proceed to render assistance to the steamship, and that his compensation should be a reasonable amount per day for the services of each tug, lighter, pump, and other thing which his company furnished. Under this agreement the tug company worked and was paid. On the night of November 25, 1898, Inman arrived at the steamship again with a tug, a scow, and two pumps. He had sent before him another tug, a barge, and about 80 men. From the time of their arrival until the steamship was towed to Duluth on December 1, 1898, his company was active and efficient in preserving the ship and her cargo. On the afternoon of November 24, 1898, Capt. Singer, the manager of the White Line Towing Company, arrived at the steamship with a tug, a barge, and about 7 men. Neither he nor his company had been requested, after the disaster, by any of the agents or representatives of those interested in the steamship or cargo, to render

them any assistance; but one of the agents of some of the underwriters had about a year before told him that when any of the vessels in which they were interested met with misfortune he wished him to go to their assistance as soon as he was able. Singer tendered to the master of the Orr the services of his tug and barge, and informed him that he had been directed by the underwriters to come to his aid. The master replied that he had engaged the manager of the Inman Tug Line to go to Duluth and return with the wrecking outfit of his company to save the ship and cargo. Thus far the facts which have been recited are established without dispute. The controversy relates to the transactions which followed. The master of the Orr, Capt. Green, testified that before Singer was permitted to go to work, and after he had informed him that he had engaged the Inman Tug Company, he asked him what his bills would be, and he replied that he would settle the same as the other wreckers. Thomas Casey, the mate of the Orr, relates the important part of this conversation in this way: "And Capt. Green says to him, he says, 'Inman is to be down; was here; and he is coming down with the wrecking outfit.' He says, 'Captain, let me go to work until he comes, and,' he says, 'my bills won't be no larger than his.' And he says, 'If they don't want me, I will go with what I have got.'" Casey also testified that when Capt. Singer was taking a second barge load of the cargo from the steamship he heard him say: "If they act the square thing with me, I will act square, and charge them only the same as Inman, and, if not, I am going to charge them salvage. I will make them pay salvage on the first load." Hare, the wheelman on the Orr, testified that Capt. Singer said in this conversation that, "if Capt. Inman came down, and he was in his way, why he would get out of the way; and, moreover, he said that it would not cost any more—he would not charge any more—than Capt. Inman was charging." No one who heard this conversation, except Capt. Singer, gives any different version of it, and he admits that he had the conversation, that the master of the Orr informed him that he had engaged the Inman Tug Company before he permitted him to commence to unload the steamship, but he denies that anything was said in the conversation about his bills or his compensation. As soon as the wreck of the steamship became known, the underwriters sent Capt. Killoran to Baptism river to take charge of the work of saving the property, and when he arrived there he found Capt. Singer engaged with his crew in loading his barge the second time. One of the witnesses testified that at this time he overheard the following conversation between Killoran and Singer: Killoran commenced by saying: "I am running this thing. I am the boss in this thing. Now, I want to know whether you are working for salvage or for day wages. If you are working for salvage, take your outfit and get away from here." "Well," Singer says, "I expect to have pay for my work." "Well, what pay do you expect to have? Do you expect to work for salvage or for pay?" "Well, I expect to have the same as others are getting." "Well," he says, "if you are willing to work for the same as others are

getting, you can stay here and work. If you expect you are working for salvage, get away from here." "Well," he says, "I expect to get the same as the rest are getting." "Well," he says, "all right. Stay here and load your lighter." When Singer was asked to state this conversation, he testified: "He asked me some question about the price, and 1 told him that I would expect the going rates for such work, and that I couldn't work down there at that time of the year as cheap as we did in the harbor. There was nothing said about Inman's rates, or anything of the kind." He also testified that Capt. Killoran ordered him to send for another pump, and guarantied him five days at the usual price of $40 per day. /This is all the evidence upon the issue whether or not the towing company agreed to render its services for the customary per diem compensation, instead of for salvage, and it seems to our minds very persuasive that such a contract was made. Compensation by the day was the usual and probable method for paying for such services on the Great Lakes. It was the way in which the Inman Tug Company, the only other wrecker that rendered like services, agreed with the agent of the owners of the steamship that it should receive its compensation. Three witnesses testified, and but one denied, that the towing company promised that it would settle for its services on the same basis as, and that its charges should be no more than, those of the others engaged upon the wreck, before it was permitted to commence its work. One witness testifies that the agent of the underwriters notified the manager of this towing company to cease his work, and to leave the wreck, if he expected salvage, and that he was permitted to continue only after he had declared that he expected to have the same compensation that others were getting. The manager of the towing company does not deny this statement, but admits that he told the agent that he expected the going rates for such work, and that at his request, and on his guaranty that he should receive $40 per day for its use, he sent for another pump. The going rates, the usual rates, the rates which other wreckers who were performing like services were receiving, were reasonable rates by the day for the tugs, barges, pumps, and other apparatus used, and the testimony which has now been reviewed is convincing that it was only after Capt. Singer had agreed to accept compensation for the services of his company at these rates that he was permitted to enter upon them, and that it was only after he had made a like promise to the agent of the underwriters that he was permitted to continue them. These facts constituted a complete contract on the part of the owners of the vessel and cargo to pay at all events, and on the part of the towing company to receive the usual compensation by the day for its services, and its recovery in this suit should have been reckoned on that basis. In this view an examination of the testimony has been made to ascertain the amount which the towing company should receive for the services it rendered, and the unnecessary damages its barge and apparatus sustained, and our conclusion is that the amount to which it is entitled is $5,245, and interest from December 4, 1898.

The second question presented is: Was the towing company guilty

of embezzlement of a part of the cargo, or of such negligence in its care that the claimants may have a deduction of their damages on this account from the amount owing to the towing company for its services? The court below answered this question in the negative. It is certain that a large portion of the cargo was stolen, but a majority of the court is of the opinion that the evidence that the towing company participated in the larceny, or that it was negligent in the care of the property, is not so clear as to warrant a reversal of the finding below upon this issue. Nor is there any finding of the court below, save that upon the issue of the contract for compensation, which is not equally well sustained by the evidence and by the opinion of this court.

The conclusion reached upon the question of the contract regarding compensation renders it unnecessary to consider the errors assigned on the appeal of the towing company, and they will not be further noticed. The result is that the decree below must be reversed; the claimants, C. W. Elphicke and others, must recover their costs in this court; the suit must be remanded to the court below, with directions to enter a decree in favor of the towing company and against the steamship and its cargo, their claimants and sureties, for $5,245, and interest from December 4, 1898, in the same proportions in which the former decree for $10,500 was rendered against them respectively; and that none of the costs in the court below be recovered of any of the parties to the suit.