## THE KENNEBEC.

(Circuit Court of Appeals, Fifth Circuit. March 22, 1916. Rehearing Denied April 19, 1916.)

No. 2880.

1. SALVAGE ⨂36—AMOUNT OF COMPENSATION—CONTRACT.
   A contract by one party to pay at all events, and by the other to receive, a fixed compensation for a salvage service to be rendered, is valid and conclusive of the amount recoverable therefor.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 85–91; Dec. Dig. ⨂36.]

2. SALVAGE ⨂36—CONTRACT AS TO COMPENSATION—VALIDITY.
   A contract by the owner of a tug to go to the assistance of a steamship aground and in a position of some danger at a stated sum per day from the time the tug left port until her return *held* not deprived of binding effect because the representative of the steamship stated that the service required was "not a salvage job, but a towing proposition," where the fact that the vessel was aground and her position were also stated, although the service actually rendered was a salvage service.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 85–91; Dec. Dig. ⨂36.]

3. SALVAGE ⨂1—NATURE OF "SALVAGE SERVICE."
   A "salvage service" is a service voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger, either present or to be reasonably apprehended.

   '[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 1, 3, 4; Dec. Dig. ⨂1.

   For other definitions, see Words and Phrases, First and Second Series, Salvage Service.]

4. TOWAGE ⨂1—NATURE OF "TOWAGE SERVICE."
   A "towage service" is one that is rendered to a vessel for the mere purpose of expediting her voyage, without reference to any circumstance of danger.

   [Ed. Note.—For other cases, see Towage, Cent. Dig. § 1; Dec. Dig. ⨂1.

   For other definitions, see Words and Phrases, First and Second Series, Towage.]

   Pardee, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Suit in admiralty for salvage by the Steele Towing & Wrecking Com-

pany against the Seaboard & Gulf Steamship Company, owner of the steamship Kennebec. From the decree, libelant appeals. Affirmed.

W. T. Armstrong, of Galveston, Tex., for appellant.

Ballinger Mills, of Galveston, Tex. (Barry, Wainright, Thacher & Symmers, of New York City, and Terry, Cavin & Mills, of Galveston, Tex., on the brief), for appellee.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge. The steamship Kennebec grounded at the mouth of the Brazos river near the jetties, about 40 miles from Galveston. S. E. Paul, the agent of the owner of the vessel, from Brazos Port, a place on shore near by, had a conversation over the long-distance telephone with Mr. Stoneburner, an officer of the owner of the steam tug, Senator Bailey, at Galveston, with reference to getting that tug to render the assistance required to get the Kennebec afloat. The result of that conversation was that Mr. Stoneburner, for his company, the libelant, agreed to furnish the services of the tug and equipment for $250 per day from the time she left Galveston until she returned. Following the making of that agreement the tug on the same day went to the mouth of the Brazos, reaching there after dark, and the next morning pulled the Kennebec from where it was aground.

[1] If the contract made by Mr. Stoneburner and Mr. Paul was a binding one, and the service mentioned was rendered in pursuance of it, though it was a salvage service, the only compensation recoverable for it is the one which was stipulated for, $250 per day, which was awarded by the decree appealed from. A valid contract by one party to pay at all events, and by the other to receive a fixed compensation for a salvage service, is as conclusive as any other valid contract. The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413; Elphicke v. White Line Towing Company, 106 Fed. 945, 46 C. C. A. 56.

[2] But it is insisted in behalf of the appellant that a binding contract was not made for the service which was rendered. Much stress is laid upon the facts that in the conversation between Mr. Paul and Mr. Stoneburner the former stated that the service desired was not a salvage or wrecking job, but was a towing proposition, while the service rendered was a salvage one. In view of the facts which were known to Mr. Stoneburner when he made the agreement and when he sent the tug in pursuance of it, we are not of opinion that the agreement was deprived of binding effect by the statement of Mr. Paul that the service required was a towing proposition, and not a salvage or wrecking job, though what was required and what was done was in fact a salvage service. At the time the agreement was made Mr. Stoneburner was distinctly informed that the Kennebec was aground at the mouth of the Brazos and needed assistance to get her off. When the conversation mentioned occurred, and for several weeks prior to that time, it was well known in Galveston that the Brazos river was in a swollen condition. It is not to be supposed that one engaged, as Mr. Stoneburner was, in doing towing and salvage work with a steam

tug operating from Galveston, was in ignorance of the fact that the current at the mouth of the Brazos then was such as to add to the peril of a vessel there aground, and to make the task of rendering necessary assistance to a vessel so situated more difficult than otherwise it might have been. At any rate, there was no misstatement or misrepresentation of the conditions prevailing at the mouth of the Brazos when the mentioned conversation occurred.

[3, 4] Though Mr. Paul stated that the service to be rendered was a towing proposition, what was desired and what Mr. Stoneburner agreed that the tug should do was so described that it was plainly disclosed to him that the service to be rendered was of a kind which the law declares to be a salvage one. "A salvage service is a service voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger." McConnochie v. Kerr (D. C.) 9 Fed. 52, 53; The Flottbek, 118 Fed. 954, 55 C. C. A. 448. That the tug, the master of which received his orders from Mr. Stoneburner, was started from Galveston to render a salvage service, is shown by this entry on its log:

"Got orders to leave for Brazos to assist a steamer ashore. Left Galveston 2:50 p. m."

The next morning, when the situation was fully disclosed, without the master of the tug intimating that the service found to be required was in any respect different from the one the tug was sent to render, it proceeded to render the required assistance to the "steamer ashore." In the absence of any misrepresentation or fraudulent concealment of a material fact, the contract as made was not deprived of binding effect by an expression by Mr. Paul of an opinion as to the nature of the service stipulated for or the assertion by him of an erroneous legal conclusion. Mutual Life Insurance Company v. Phinney, 178 U. S. 327, 343, 20 Sup. Ct. 906, 44 L. Ed. 1088; Johansson v. Stephanson, 154 U. S. 625, appx., 14 Sup. Ct. 1180, 23 L. Ed. 1009; Upton, Assignee, v. Tribilcock, 91 U. S. 45, 50, 23 L. Ed. 203. He misstated, not the facts, which as a matter of law determine the nature of the service desired, but merely the name of it. We are not of opinion that it was made to appear that there was any such misstatement or fraudulent concealment of a material fact as to deprive the agreement which was made of its binding effect or to make it inapplicable to the service which was rendered.

In the case of The Flottbek, supra, it was held that a provision in a contract between the owner of a tug and the owner of a ship that the former would, during the period covered by the contract, render any towage required by the latter at specified rates, did not govern the compensation for a salvage service rendered by the tug. The decision in that case is not opposed to the conclusion reached in the case at bar that a contract for a service known by both the parties to be of a kind which the law denominates a salvage service is not vitiated by the fact

that the party procuring the rendition of it stated to the other party that it was a towage service.

The decree appealed from is affirmed.

PARDEE, Circuit Judge (dissenting).    The services rendered by the steam wrecking tug Senator Bailey to the steamship Kennebec are conceded to have been salvage services, and they were not adequately compensated by an allowance of $250 per day for two days.    Under the alleged parol contract, which the court construes as covering salvage services, the services of the Bailey were expressly limited to towage services, and said contract ought not to control, so as to deprive the appellant from recovering for the salvage services undoubtedly rendered.

The Senator Bailey is a large, heavy wrecking tug, about 125 feet long, and draws from 15 to 16 feet of water, and her beam is 26 to 27 feet and equipped with large automatic towing machinery, 800 actual horse power, and carrying a full line of wrecking equipment, worth $100,000.    The contract was made over long-distance telephone between Paul, the managing agent for the owners of the Kennebec, and Stoneburner, agent for the Bailey.    Paul's version of the alleged contract is:

"I got Mr. Stoneburner on the telephone and told him that the Kennebec was ashore on a lump at the mouth of the Brazos jetties, and I told him it was not a salvage job, but a towing proposition, and I wanted a flat rate per day; he asked me to wait a minute, and he went off, and came back, and said he would name us a flat rate of $250 per day, from the time the towboat left Galveston until she returned, and I asked him what constituted a day, and he said 24 hours. Q. What did you say? A. I said, 'Let her come.'"

Stoneburner's version is:

"About 10 o'clock on Saturday morning, May 1st, long-distance telephone rang and called for Mr. Stoneburner, and I answered the phone; and it was Mr. Paul, of Freeport, on the line, and he asked me about the Senator Bailey, where she was, and I told him, and he said the Kennebec had run onto a lump and needed a little pull to get her off, and I inquired whether the service was in the nature of salvage and wrecking or not, and he said the services were not in the nature of salvage or wrecking, that it was towing, and I said, 'Wait a minute,' and Mr. Steele was there, and I went into Mr. Steele's office and talked to him, and I went back to the telephone and told Mr. Paul that if it was not a wrecking service, but a towing proposition, that I would furnish the service of the tug and equipment on a charge of $250 per day from the time she left Galveston until she returned, and he said, 'Send the tug.'"

Paul and Stoneburner are equally credible, and if the court finds a contract proved it ought, considering that the burden of proof is on the claimant, to take Stoneburner's version as the correct one.    At the time, Paul was on the ground at the mouth of the Brazos river, and had been for 24 hours, during which time he had fully acquainted himself with the situation, having been twice, at least, on board the Kennebec, and had learned of the soundings that had been made, and well knew that the ship Kennebec, after going aground, had shifted her position further inshore, and that he had attempted to get the Alex Brown, a towing tug of 450 horse power, to pull the Kennebec off, which, though authorized by the owners, was rejected by the master

of the Brown, alleging the inability of his tug, under the circumstances, which he fully investigated, to do the necessary work, all of which he suppressed and concealed in his communications with Stoneburner, particularly asserting, in answer to Stoneburner's inquiries, that the Kennebec had run on a lump and needed a little pull to get her off, and that it was a case of towage, and not of wreckage or salvage. Paul also knew of the extremely high water and swift current of the Brazos river, and that on account of said high water and the drifting logs therein services rendered in the pulling off from the shore and into the channel of the Kennebec would be very hazardous and extremely difficult.

At the time that the Bailey arrived on the ground Paul admits the ship had shifted her position further inshore at least 400 feet, and this alone is sufficient to render the contract for towage inapplicable. The master of the Bailey had only authority to carry out his owner's instructions to pull the Kennebec off, and he had no authority to modify or repudiate his owner's orders, nor to enter into any new contract. In The Flottbek, 118 Fed. 960, 55 C. C. A. 454, cited by my Brethren as supporting the maintenance of the contract for towage, the contract was:

"The party of the first part agrees to tow with reasonable and quick dispatch *all* the vessels owned and controlled by parties of the second part that may be in the waters of Straits of Juan de Fuca, Puget Sound, British Columbia, or vicinity, whether inside or outside of Cape Flattery, and that may require any towage service during the continuance of this agreement, at the rates specified below."

And the case shows that at the time the services were rendered the salved vessel was uninjured and afloat in 25 fathoms of water, and that all the services rendered were towage services, and the court disregarded the contract and held the services were salvage services by reason of the peril of the salved vessel. I think it is well settled that a ship aground on the Texas shore, shifting her position further inshore and unable to get afloat by her own exertions, is in decided peril.

The services rendered the Kennebec were very hazardous and difficult, and but for the great power and salvage appliances of the Bailey would have resulted in failure to rescue the Kennebec and in serious damage to the Bailey.