## MAGNOLIA PETROLEUM CO. v. NATIONAL OIL TRANSPORT CO. et al.

(District Court, S. D. Texas, at Houston. May 18, 1922.)

### No. 52.

**1. Salvage ⬤⇒36—Contract for payment not binding under all circumstances.**

While a contract for salvage services is presumptively valid, it will not be enforced, where the compensation demanded was clearly exorbitant, in view of the anticipated service and risk, and was agreed to only under circumstances amounting to compulsion.

**2. Salvage ⬤⇒36—Contract for services held not enforceable, though one for salvage; compensation for towage fixed.**

An oil-laden barge, without motive power, was anchored in the Gulf of Mexico, while her tug went for coal, and remained for three days when she was out of fresh water and fuel for her pumps. Libelant's tug, on the way to Tampico with a tow, offered to take the barge in for $20,000. The master of the barge after trying without success to reach his owners by wireless, in view of his situation, the danger of storms at that season, and the threat of the tug to leave him, finally signed a contract for $15,000, though protesting that it was unreasonable. The tug towed the barge to Tampico, without risk, and with a delay to its own voyage of not more than eight or ten hours. *Held* that, while the service was one of salvage, the contract was inequitable, and would not be enforced, and the tug given an award of $3,000.

**3. Salvage ⬤⇒26—Service rendered under unconscionable contract not liberally rewarded.**

Where a salvage service is rendered, not in a spirit of humanity or helpfulness, in reliance on a fair and reasonable reward, but in the faith of an unconscionable contract, such fact will be taken into consideration, and warrants a departure from the general rule of liberality.

**4. Shipping ⬤⇒50—Owner held not liable to charterer for damage caused by defective coal.**

Under a charter party for a tug for towage services, providing that the master should be under the orders and direction of the charterer, the owner cannot be held liable for damage sustained by a tow, because the master, by direction of the charterer, left port without a supply of proper coal.

In Admiralty. Suit by the Magnolia Petroleum Company against the National Oil Transport Company, with the United States Shipping Board Emergency Fleet Corporation impleaded. Decree for libelant, and cross-action against the Fleet Corporation dismissed.

F. D. Minor (of Minor & Minor), of Beaumont, Tex., for libelant.

Lockhart & Lockhart, of Galveston, Tex., for respondent.

D. E. Simmons, U. S. Atty., of Houston, Tex., for United States Shipping Board Emergency Fleet Corporation.

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HUTCHESON, District Judge. This is a libel, brought on behalf of the owners and crew of the tug George C. Greer to enforce an agreement for salvage executed by the master of the Bolikow while at sea, 120 miles from Tampico, on the following contract:

"To Master and Owners of Tug George C. Greer: I agree to pay the sum of fifteen thousand dollars for towing barge Bolikow hailing from Beaumont, Tex., of which National Oil & Transport Co., Galveston, Tex., are owners, to be towed to Tampico, Mexico.    Master J. B. Bodden, Barge Bolikow."

The libel also prays for an award, should the agreement not be enforced. The National Oil Transport Company answered by cross-action, asserting that for whatever amount they might be condemned to pay in this suit they should have judgment over against the United States Shipping Board Emergency Fleet Corporation, from whom the National Oil Transport Company had chartered the tug Barryton, since, as they allege, the plight of the Bolikow, which brought about the necessity for the services rendered to her by the Greer, was caused by the fault of the Barryton in not having proper fuel, for which fault they assert the United States Shipping Board ought to be held responsible. The facts, briefly stated, are:

About the 18th of October, 1920, the United States Shipping Board Emergency Fleet Corporation made an agreement with the National Oil Company, charterers, for the use of the tug Barryton to be employed in towing the barge Bolikow, etc., between Galveston, Tex., and Tampico, Mexico. The charter party, among other provisions, contained the following:

"The managers and operators shall, at the tug's sole expense, man, operate, victual, and supply said tug with deck, engine, and other necessary stores. The charterers shall pay for all fuel, fresh water, port charges, consular fees, pilotage, and all other costs and expenses incident to the use and operation of the tug."

The charter party further provided:

"The charterers shall accept and pay for all coal in the tug's bunkers, and the managers and operators shall, on the expiration of this charter party, pay for all coal left in the bunkers."

Further:

"That the captain shall prosecute his voyage with the utmost dispatch and shall render all customary assistance." "The captain, although appointed by the managers and operators, shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements, and the charterers hereby agree to indemnify the managers and operators from all consequences or liability that may arise from such orders."

About November 21, 1920, the steam tug Barryton left Tampico with the barge Bolikow loaded with a cargo of oil. Prior to her departure from Tampico, the Barryton had experienced a great deal of trouble in getting coal, and finally, through the efforts of the charterers' agents at that port, she procured sufficient coal to make the voyage, had the coal been of the proper quality. As a matter of fact the coal was of a very defective quality, and it was apparent to the engineer and to the master of the tug, when they were not many hours out from Tampico, that they would have trouble in making their destination.

281 F.—22

This apprehension developed into certainty, and the Barryton anchored the Bolikow approximately in latitude 24° 12' north, longitude 97° 24' west, and returned to Tampico for fuel, directing the Bolikow to await her return.

The Barryton, having again encountered great trouble in bunkering, was unable to return to the Bolikow until more than three days had passed. During this time the Bolikow, having no power of her own, except sails, which she could not use for fear of causing a dangerous shift of her cargo, and having only sufficient fresh water for a limited time, found herself, on November 25, with her fresh water exhausted, her fires extinguished, and a tendency to list because of her inability to trim ship, since she had no fresh water for steam with which to operate her cargo pumps. Neither could she pump out her bilges in case she should begin to leak. Although the weather up to this time had been fair, the barometer was falling, though not severely, and there was some probability, though not very immediate, that from the nature of the winds then prevailing a storm might develop.

The situation then being what it was, with conditions such that, if the weather took an untoward turn, or the return of the Barryton was much longer delayed, the condition of the Bolikow might become very serious, the tug George C. Greer, with the barge M. P. Co. No. 7, was sighted, and the Bolikow signaled her to come alongside. The Bolikow had no wireless, and at her request the Greer attempted to wireless the Bolikow's owners. No answer was received, however, until after the agreement sued on had been made and performed. The Bolikow's master, being unable to hear from her owners, entered upon negotiations with the master of the Greer for a tow to Tampico. The master of the Greer first proposed a compensation of $20,000. The master of the Bolikow declared this demand unreasonable, and after some further discussion and effort on the part of the Bolikow's master to obtain what he thought was a reasonable price, and after the master of the Greer had advised the Bolikow that he would take him in for $15,000, and if he did not pay that he would leave, the agreement above referred to was executed, the Bolikow's master testifying that he considered the amount agreed upon unreasonable, and that he made the agreement only because he was afraid to take the risk to crew and vessel of staying out longer, in the Bolikow's then condition.

The Greer then made the Bolikow fast to the stern of the barge M. P. Co. No. 7, and on November 26, 1920, anchored her in a place of safety in Tampico. The tug Greer and the barge M. P. Co. No. 7 are merchant vessels of the United States, belonging to the Magnolia Petroleum Company. The Greer is a steam tug, using fuel oil, 151 feet long, 27 feet in beam, 16 feet deep, and 900 horse power, worth at least $225,000, thoroughly equipped for towing or salvage service. The barge M. P. Co. No. 7 is a wooden tank oil barge, 254 feet long, 48 feet beam, 20 feet deep, and worth $300,000. The Bolikow is a wooden tank barge, 267 feet in length, beam about 46 feet, depth of hold about 23 feet, with a gross tonnage of about 225 tons, and at the time in question had a full cargo. The Bolikow at the time was worth $225,000, with a cargo worth $30,000.

From these facts and others in evidence it appears that the Bolikow was in such position and her circumstances were such that the services of the Greer were of a salvage nature, voluntary, meritorious, and efficient, and that the libelants are entitled to compensation as for salvage. It does not appear, however, that the danger was imminent or overwhelming, nor was there any difficulty or danger connected with the rendition of the services which should go to swell an award. The case, in short, is one where the Bolikow, in the absence of the contract claim, would be undoubtedly liable for a reasonable salvage award, and the real question is whether the court should assess that award or should enforce the agreement as made.

[1] The libelant asserts with confidence that a contract of this kind is clearly enforceable in accordance with its terms. It refers, not only to The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413, but to the two cases decided in the Circuit Court of Appeals for the Fifth Circuit, The Kennebec, 231 Fed. 423, 145 C. C. A. 417, and The Parisian, 264 Fed. 511, while the respondent asserts with equal vigor that the circumstances of this case make it one of hardship and inequity, which would invalidate the agreement. It is true that in The Kennebec the court did say:

"A * * * contract by one party to pay at all events, and by the other to receive a fixed compensation for a salvage service" to be rendered, "is as conclusive as any other valid contract"

—and that in The Parisian it said:

"Though a service is one which helps to save a vessel endangered at sea, a valid contract by one party to pay at all events, and by the other to receive either a fixed or reasonable compensation for such service, is as conclusive as any other valid contract."

And it is further true that in the case of The Elfrida, upon which case the two last cited rely, it was said:

"Where no such circumstances exist as amount to a moral compulsion, the contract should not be held bad simply because the price agreed to be paid turned out to be much greater than the services were actually worth."

And further: "The presumptions are in favor of the validity of the contract," and that The Elfrida also refused to follow the more liberal rule prevailing on the continent with reference to these contracts.

It must be borne in mind, however, that all that the Circuit Court of Appeals held was that, if the contract was valid, it must be enforced, and that it did not undertake to discuss the question of what would make it invalid, and that all that the United States Supreme Court said was that contracts of this kind were prima facie valid, and circumstances must be made to appear which would make them invalid. In The Elfrida, speaking of compulsion, it is said:

"The fact that the contract was made at sea, or under circumstances demanding immediate action, is an important consideration."

And also in that same case it is said, after calling attention to the fact that the ship there contracted about was stranded off shore, the crew was not imperiled, the master had communicated fully with the ship's

agents and owners, and the contract had been made with careful and complete deliberation:

"Had the agreement been made with less deliberation, or pending a peril more imminent, our conclusion might have been different."

All that that case can be relied upon with confidence as ruling is that a contract which is deemed reasonable by the parties at the time it was made, which was made under circumstances permitting care and deliberation, and where all of the contracting parties were satisfied with it at the time of making the contract, cannot be considered unreasonable merely becuse of subsequently transpiring events. It is not in that or any other case held that a contract, made at a time when the master making it believed that his vessel was in danger on the high seas, and that if he did not make it the property of his owners and the lives of his crew would be in danger, and made by him after an effort to induce a more reasonable agreement, and a notice from the rescuing tug that its terms must be accepted, or it would steam away, cannot be stricken down, if its conditions appear inequitable or unduly harsh.

[2] In this case the master was on the high seas. He made a vigorous effort, but could not communicate with his owners. The master of the Greer, at the request of the Bolikow, sent the following message by wireless:

"Barge Bolikow's fires dead. Tug George C. Greer alongside. Reply if take tug back to Tampico or not."

When he was unable to obtain an answer, and found that he must act upon his own responsibility, the master of the Bolikow attempted to negotiate a reasonable agreement with the Greer, and after he had rejected the original demand of that tug for $20,000, and had endeavored to bring the Greer to a juster point, signed the agreement, not because he thought it was just or reasonable, but because he felt that, confronted as he was with the apprehension of being left at sea, with his cargo and crew in possible danger, he was morally compelled to take the service on any terms on which he could get it.

I think it clear that this case is ruled by the general principle, announced in The Elfrida and other cases, that there is a clear right in the courts to set aside a salvage agreement, when made on the high seas under compulsion or hardship, morally or otherwise, when such agreement is unconscionable and inequitable, as this agreement plainly is. The evidence shows that, without any danger to the crew of the Greer, or to the Greer herself, or her barge in tow, the M. P. Co. No. 7, the Greer took the Bolikow in tow at 10:30 a. m. on November 25, having sighted her at 8 a. m. the same day, and at 2:15 p. m. November 26, let her go in the harbor of Tampico.

The log of the Greer shows that during all the time of the service there were light breezes, partly cloudy, smooth seas, with rains, southerly and easterly, though on the morning of the 26th the weather was somewhat cloudy and threatening. It further appears that, without incident or injury of any kind, the tow was commenced and completed; that the tug Greer was bound to Tampico anyway, and that, while taking on the second cargo slowed up her time somewhat, the whole adventure could not have delayed the Greer more than eight or ten hours.

The circumstances above related, that the fires of the Bolikow were dead, her water exhausted, that she had no method of self-propulsion, and that it was at a time of the year when a storm might arise, which probability is proven by the fact that on November 29 a heavy norther sprung up, and further that the Bolikow, in the opinion of the master, was in some danger, prevents the service being classified as a mere towage service, and justifies the court in rendering an award other than for towage.

Awards of salvage are not based upon the theory of quantum meruit, or remuneration proportioned exactly to the service rendered, but are designed to encourage and promote the display of natural human kindness on the high seas, by rewarding those who display it liberally for actual services rendered. When, however, the service is not rendered in this spirit, in reliance upon a reasonable and fair award being made, but upon the faith of an agreement evidencing the hard and unscrupulous exactions of a legalized piracy, the court, in making its own award, cannot but be influenced by that spirit to make its award less than it would otherwise have been.

Not that the court should deny the salvors a reasonable award, but that it should deny liberality to the award, because that spirit in the salvors, which in the opinion of the courts has entitled them to liberal treatment, is wholly absent in this case. Had the services been untainted with the exactions sought here to be enforced, I would have felt that an award of $5,000, while liberal, was not excessive. Under the circumstances, I believe a reasonable, though not a liberal, award should be $3,000, a sum far in excess of a towing charge for similar services, and judgment will be entered for libelants for said sum, to be divided between the crew and the owners, in the proportion of two-thirds to the owners and one-third to the crew, the division among the crew to be in proportion to their monthly wages, and, the libel having been brought to recover on an unreasonable contract, the costs, except as to the cross-action, to be adjudged against libelants.

It is not necessary for the decision of this case to hold, and it is not held, that the Act of August 1, 1912 (Comp. St. §§ 7990–7994), entitled "an act to harmonize the national law of salvage with the provisions of the international convention for the unification of certain rules with respect to assistance and salvage at sea, and for other purposes," has established for these cases the liberal continental view as to the authority of the courts over these agreements, as adverted to in The Elfrida. In view, however, of the language of section 2 of that act (Comp. St. § 7991), that "the master, or person in charge of a vessel, shall so far as he can do so without serious danger to his own vessel, crew, or passengers, render assistance to any person found at sea in danger of being lost, and if he fails to do so he shall, upon conviction, be liable to a penalty of not exceeding $1,000 or imprisonment for a term of not exceeding two years, or both," it ought to be strongly doubted whether any person has a right to bargain with those in peril on the seas for an unreasonable compensation, and then use the courts of admiralty to enforce it. Ought it not rather to be held that, in the light

of that statute, the law is as expressed by the Supreme Court in The Tornado, 109 U. S. 117, 3 Sup. Ct. 82, 27 L. Ed. 874:

"Every agreement for salvage compensation is subject * * * to the judgment of the court as to its being equitable and conformable to the merits of the case."

[4] As to the cross-action of the National Oil Transport Company, it appearing by the terms of the charter party that the master was for the time of the charter under the direction and control of the charterers, and that the fault was the fault of the charterers in obtaining improper coal, in giving sailing directions to the master in that condition, and of the master in proceeding without having proper coal, and that the United States Shipping Board was in no sense, directly or derivatively, responsible for the condition which caused the loss, the cross-action is denied, and the costs connected therewith and growing thereout are adjudged against the National Oil Transport Company.