## THE PENDRAGON CASTLE. THE SAPINERO. LANCASHIRE SHIPPING CO., Limited, v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. December 15, 1924.)

No. 109.

**1. Salvage ⬤⇒8—Standing by leaky vessel in situation of apprehended danger and lending men to jettison cargo constitute "salvage services."**

Standing by leaky vessel in situation of apprehended danger and lending men to jettison cargo constitute "salvage services."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Salvage Service.]

**2. Salvage ⬤⇒5—Service rendered to leaky vessel real, though only real danger was because of master's unfitness.**

Where incompetent and unfit master of leaky vessel called for convoy, libelant's vessel, responding and accompanying the other to port, and lending men to assist in jettisoning cargo, rendered real service; the unfitness of salvaged vessel's master being real danger to craft, though his fears of sinking were groundless.

**3. Salvage ⬤⇒29—Award of $60,000 held excessive for convoying leaky vessel, and reduced to $35,000.**

Award of $60,000 to vessel, worth $3,000,000 with cargo, for convoying leaky vessel worth $2,000,000 with cargo, and lending men to assist in jettisoning cargo, because of unwarranted fear of unfit master, *held* excessive, and reduced to $35,000, where services involved only about two days' loss of sailing time.

Appeal from the District Court of the United States for the Southern District of New York.

Libel for salvage by Lancashire Shipping Company, Limited, in its own behalf as owner of the steamship Pendragon Castle, and on behalf of the master, officers, and crew of said steamship, against the United States, as owner of the steamship Sapinero, her cargo and freight. Decree for libelant, and respondent appeals. Award reduced.

William Hayward, U. S. Atty., of New York City (Walter Schaffner, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Ers-

kine, of New York City, of counsel), for appellee.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge. The leading facts are not in dispute. The Sapinero was a new cargo boat, which on March 12, 1919, sailed from Philadelphia for Falmouth, England, with a cargo of grain. Late in the afternoon of March 19th the Pendragon Castle, which was on a voyage to Havre, France, began to receive wireless messages from the Sapinero's master. These messages stated that his grain had gotten into the pump suctions; that his "condition is not serious at present, but may be later; * * * if possible, assist me to get convoy." Later on that day the Sapinero similarly said: "Situation is peculiar; ship is leaking in the top sides; grain is absorbing the water; we are in no immediate danger, but I would like to get convoy in case cargo swells." It is unnecessary to quote further from these messages, but upon the whole they amounted to an urgent demand for assistance.

The Pendragon Castle was not the first vessel to respond to the Sapinero's calls. A Dutch cruiser first came, but owing to lack of coal this vessel was unable to keep pace with the ship that called for help, which was continuing at a fair speed, notwithstanding her condition. Consequently, in response to further appeals, Pendragon Castle joined the Sapinero at 9 p. m. on March 22d. At this time the vessels were about 1,100 miles from Plymouth. Traveling together, they reached Plymouth shortly after 8 p. m. on March 28th. During the voyage Pendragon Castle furnished from her crew all the men she could spare to assist in jettisoning grain from Sapinero. The latter vessel had started with 6,154 tons on board. Her pumps being clogged, the water did rise high enough to completely spoil 199 tons. Probably some of the grain was dampened, and thereby increased in weight, but after arrival in Plymouth the difference in weight between the discharged cargo and the cargo loaded was less than 550 tons.

The Pendragon Castle was not asked to tow, and never did tow; on the contrary, Sapinero had to slow, so as not to drop her convoy. We believe the weather was not at all unusual, though the sea was at times high. One boat was smashed in transporting men between the vessels, but no one was injured. After discharging cargo Sapinero was extensively repaired. Defective dunnage or poor ceiling was the cause of the pumps clogging; but repairs were proper, because the original construction of the vessel was defective, in that many rivets were not fully or properly driven home.

The change of Pendragon Castle's course from Havre direct, to Plymouth, gave rise to some delay. Undoubtedly libelant's vessel was in attendance on Sapinero for six days, and by estimate her ultimate arrival at discharging berth was deferred between two and three days. The salving vessel's expenditures and losses were agreed upon at $995; so that at this bar we think the sole question is whether $60,000 as a salvage award is such a violation of just principles, or departure from the path of authority, as to require correction on appeal (The Bay of Naples, 48 F. 737, 1 C. C. A. 81), remembering that otherwise appeals in salvage "are not encouraged" (Oelwerke, etc., v. Erlanger, 248 U. S. 521, 39 S. Ct. 180, 63 L. Ed. 399).

[1] That standing by in a situation of apprehended danger is service of a salvage nature is sufficiently established (The Hudson [D. C.] 68 F. 936); and undoubtedly the lending of men to the vessel in danger for the purpose of jettisoning cargo is even more directly a salvage service; i. e., something "designed to relieve [the benefited vessel], from some distress or danger either present or to be reasonably apprehended" (The Kennebec, 231 F. 423, 425, 145 C. C. A. 417, 419).

[2] Thus the ultimate questions here are:

(1) What caused the apprehension of danger on board the Sapinero?

(2) Was that apprehension of danger justified?

(3) Did the Pendragon Castle remove that apprehension of danger, and in so doing render actual service?

We do not intend to detail the evidence further. The picture presented would not better any one's opinion of human nature, nor contribute anything useful to the law. We shall summarily answer our own questions thus:

1. The undoubted apprehension of danger by the Sapinero's master, which induced him to cover the North Atlantic with calls for aid, was the result of incompetence on his part. Whether that incompetence resulted from drink or disease, or both, we are not sure, but the man was unduly frightened and behaved accordingly.

2. His apprehension was apparently that he would fill and sink. We find no evidence justifying that fear.

3. The Pendragon Castle did remove the master's apprehension, and it did render actual service.

The Sapinero needed assistance, if for no other reason than that her captain was unfit. Such a captain as this vessel had is a serious danger to any craft. Further, it was a measure of precaution to jettison some grain. Whether that jettison did more than calm the nerves of the Sapinero's master is rather doubtful; but that it was a good thing for and a real service to this vessel to have an apparently properly commanded and able ship in attendance is not doubted.

The master of the Pendragon Castle went on board the Sapinero; so did one or more of his officers. They all testified, though the master of the Sapinero did not appear·at trial. Our inference from their evidence is that, to speak colloquially, they saw they had a good thing and made the most of it. But in this we do not perceive anything legally wrong, and even morally the offense was not great. They were wanted, and they stayed, even if they stayed with their tongues in their cheeks.

[3] The values concerned are unusually large. Libelant's ship had a cargo of cotton of great value; that cargo, with the ship, was in 1919 worth about $3,000,000. The Sapinero and·her cargo were worth about $2,000,000. But the percentage awards, which in small cases of undoubted salvage are so common, do not in cases of this kind furnish a fair criterion for award. The Livietta, 242 F. 195, 155 C. C. A. 35.

So the ultimate question is this: What is a fair award for six days of convoying a frightened master with a not very leaky ship —an act which involved about two days' loss of time? As Holmes, J., remarked in Oelwerke v. Erlanger, supra, "the work seems to deserve neither much praise nor much blame," and when we consider the awards heretofore made in cases of actual towage, with large values concerned, we are convinced that the award given below comes within the rule stated in The Bay of Naples, supra. The principal decisions were collected in The Western Pride (C. C. A.) 274 F. 920. Our conclusion is that the award for services in the nature of salvage should be reduced to $35,000, so that the final decree, as corrected, will be for that sum, plus $995, and the costs of the District Court.

·The decree will be corrected as of the date of original entry, January 16, 1924, and draw interest from that day. As a matter of discretion, there will be no costs in this court.